*In re* WALTER B., a Minor (The People of the State of Illinois, Petitioner-Appellant, v. Anita B. *et al.*, Respondents-Appellees).

First District (2nd Division)  No. 1—91—3737

Opinion filed March 24, 1992.

Patrick T. Murphy, Public Guardian, of Chicago (Lee Ann Lowder and Ellen O'Brien, of counsel), for appellant.

Rita A. Fry, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellees.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

The public guardian appeals the circuit court's findings against a petition for adjudication of wardship, and seeks reversal and remandment. The issues raised on appeal include whether the court's findings of unproved sexual abuse, neglect in providing necessary care, neglect in the environment, and physical abuse were against the manifest weight of the evidence.

The State filed this action in the interest of Walter B., Jr. (Walter), a five-year old child, alleging abuse and neglect of Walter by respondents, his parents, and petitioned for Walter's adjudication as a ward of the court. The parents stipulated to a finding of probable cause and urgent immediate necessity and the circuit court placed Walter in the temporary custody of the Department of Children and Family Services.

The following evidence was adduced at the adjudicatory hearings. Park Forest police officer Linder testified that on May 2, 1991, he was dispatched to Walter's home. There, Walter's father informed him that Walter's mother called the police, adding that she punched Walter in the stomach with her fist. Officer Linder observed Walter crying hysterically. Walter told him "Mommie punched me." Officer Linder described the conditions of the house as unacceptable, with garbage piled in the kitchen, the stove in a state of disrepair, dirt and filth on the walls, and an odor about the house. Because an allegation was made that Walter was a victim of sexual abuse by his father, Officer Linder and the family proceeded to the police station.

Walter understood questions and gave Officer Linder slow, but proper, responses. After being shown anatomical drawings of a nude male adolescent at the police station, Walter volunteered the information to Officer Linder that he "whistled on his daddy's pee-wee." He described whistling as blowing, pointing to his tongue. "Pee-wee" was the word he used for male genitals. Officer Linder later heard Walter inform Park Forest Detective Michael McNamara, who interviewed Walter next, that his father would "pee-pee" in his mouth and he had a real bad taste in his mouth.

Walter's mother told Officer Linder that on April 30, she saw Walter and his father in the bathroom naked. Walter was stroking his father's penis. When the father saw her, he reprimanded Walter for such action. She saw them in bed together often. Immediately prior to May 1, she observed them in bed; Walter's penis was erect, and his father was stroking his thigh. She punished Walter for this, stating

that is why she punched him in the stomach. Upon being requested to remain at the station until the child could be released to her custody, Walter's mother told Officer Linder she wanted no part of the child, it was "his" son, she just wanted to walk away from the situation, and they could do whatever they wanted to Walter.

Walter's father, when interviewed by Officer Linder, denied the allegations, indicating the reason the mother made up the complaint was to get back at him. Both he and Walter's mother used narcotics at one time. He informed Officer Linder that he showered with Walter to bathe him, which was his responsibility.

Detective McNamara, then a juvenile protection officer, testified Walter had no trouble understanding him and answered his questions right away. Walter told him that he had whistled on his father's pee-wee. His father would "pee-pee" in his mouth, leaving a very bad taste, and the boy mentioned the word "accident" in this connection. When asked whether he ever touched his father's "pee-pee," the five-year-old boy demonstrated how he masturbated his father's penis. Walter then stopped answering questions.

Substantially the same statements made by the mother to Officer Linder were given by her to Detective McNamara. In addition, she told Detective McNamara that on at least three occasions in the preceding few weeks she had seen Walter in the shower with his father and the father had Walter "grabbing" the father's penis, which was partially erect.

Detective McNamara saw Walter again one week later at LaRabida Hospital. He was willing to play with blocks and colors but, when questioned about body parts, Walter dropped his head, crossed his arms and turned away. He would make no further statements.

On May 3, Detective McNamara interviewed Walter's father, who informed him that his wife was crazy and made up the story due to an argument the night before. When asked why Walter would say that he put his penis in Walter's mouth, the father cried and denied it, adding he did not want to lose his job or go to jail. Walter's father admitted giving him showers, but kept him at arms' length to avoid problems. Once, he conceded, his penis may have accidentally brushed up against the boy's face, but he denied putting it in Walter's mouth.

Priscilla Cash, a caseworker employed by the office of the public guardian, testified that she has interviewed thousands of children in her position. She interviewed Walter on May 6. He understood her questions and answered appropriately and without hesitation. Walter informed her that more than once his mother hit him in the stomach with her fist. The boy told her that his father peed in his mouth. He

did not like taking showers with his father because his father "messed" with his pee-pee and rubbed against his legs and back. Walter further indicated with his hands that his father put his penis in Walter's "butt."

On May 6, 1991, a petition for adjudication of wardship was filed in the Cook County circuit court, juvenile division, on behalf of Walter, alleging sexual abuse (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(2)(iii)); neglect in the environment (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(1)(b)); neglect in providing necessary care (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(1)(a)); and physical abuse (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(2)(i)). The court appointed a temporary custodian and a guardian *ad litem* for the child. An attorney was appointed for the mother and the public defender appeared for the father. Adjudicatory hearings were held on October 24, November 8 and November 22, 1991, at which the previously described evidence was given.

The State and guardian rested.

A Mt. Sinai staff psychologist assigned to its pediatric ecology unit, Dr. John A. Mason, testified as a witness for both the mother and the father. He had been on staff for almost 1½ years. He interviewed Walter for 45 minutes on June 7 and found him moderately mentally delayed, "avoidant [*sic*]" and that he had difficulty in understanding questions. When asked to name his private parts he became very agitated and covered his face. Walter had trouble articulating and communicating his thoughts; he had received some form of mistreatment. He feared attacks from caretaking adults, which Dr. Mason interpreted as Walter having been mistreated by his caretakers. Many such fears were focused around mothering figures.

On cross-examination, Dr. Mason acknowledged that he was not aware of Walter's statement to Officer Linder about sexual abuse by his father. Walter's agitation and looking away when asked about sexual abuse suggested the possibility that he was sexually abused. When asked about "bad touches," Walter did not make reference to his father, only to his mother punching him. Dr. Mason found possible sexual abuse by the mother and probable physical abuse by the mother. He never asked Walter about the alleged acts of oral copulation between him and his father.

Medical records from Mt. Sinai Hospital, where Walter had been evaluated, were admitted into evidence. They show an entry, "suspicious for sexual abuse by unknown perpetrator [*sic*], but not the father" and another note reading "consistent with a history of physical abuse by the mother." A plan before the child returned home was recommended, as well as strict supervision of the mother's visitation.

Also contained in the medical records is an entry stating Walter denied that anyone put anything in his mouth, sexual activity with his father and a statement that his mother had on at least one occasion punched him in the stomach. The record further indicates the mother "made allegations that father [*sic*] touched Walter's genitals. She has also recanted her statements periodically."

The court dismissed the physical abuse count and the neglect of necessary care count on defense motions.

Walter's father testified thereafter on his own behalf. He acknowledged taking showers with his son, but he did this in order to teach him personal hygiene. He denied touching Walter in a sexual manner, or telling Detective McNamara his penis may have brushed against Walter's face. He denied seeing or stating either to police or hospital personnel that he saw his wife punch Walter in the stomach. He denied lying naked in bed with his son.

After argument, the court found the remaining charges not proved and dismissed the petition and vacated custody. This appeal followed.

I

The guardian contends that the court erroneously found the charge of sexual abuse not proved. The guardian asserts the testimony given relating to Walter's out-of-court statements was corroborated by his mother's statements and, therefore, the evidence was legally sufficient to sustain a conviction under section 2—18(4)(c) of the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1987, ch. 37, par. 802—18(4)(c)) (section 2—18(4)(c)).

The proceedings before the circuit court were not criminal, but civil, in nature and were not to be considered adversarial. (*In re J.J.* (1991), 142 Ill. 2d 1, 8, 566 N.E.2d 1345.) Of primary importance here, as in the circuit court, are the best interests and welfare of the child. *In re J.J.*, 142 Ill. 2d at 9.

In the present case, after weighing all the evidence, the circuit court observed that the mother's corroborating statements were recanted; Walter indicated no such abuse occurred; Walter had low mental abilities; and the father's testimony indicated no abuse occurred. The court found the State did not carry its burden, based upon the evidence and on "what I think is not corroborative evidence."

Section 2—18(4)(c) provides:

"(c) Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject

to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." (Ill. Rev. Stat. 1989, ch. 37, par. 802—18(4)(c).)

The statute demonstrates the legislature's determination that a victim's assertions of abuse or neglect are inherently reliable as exceptions to the hearsay rule in an effort to meet "the pervasive and unique problem of child sexual abuse." (*In re Marcus E.* (1989), 183 Ill. App. 3d 693, 703, 539 N.E.2d 344.) As suggested by the United States Supreme Court in another context, a child's statements of abuse or neglect should be deemed sufficiently "trustworthy that adversarial testing can be expected to add little to [their] reliability." *White v. Illinois* (1992), 502 U.S. ___, 116 L. Ed. 2d 848, 112 S. Ct. 736.

▪ The Act requires, however, that the child's out-of-court statements be corroborated by evidence which, by its nature, makes it more probable than not that the child was abused. (*In re C.C.* (1991), 224 Ill. App. 3d 207, 213-14 (*C.C. & R.C.*).) The evidence deemed sufficient to serve in corroboration necessarily varies depending upon the facts involved. *In re Brunken* (1985), 139 Ill. App. 3d 232, 487 N.E.2d 397.

▪ At the Park Forest police station, where she went voluntarily, Walter's mother told police that his father was always "messing" with Walter. On no less than three occasions in the preceding weeks she saw Walter grabbing his father's partially erect penis while they showered together. She saw Walter stroking his father's penis after they had just gotten out of a shower they had taken together. She saw the father and son spend a lot of time together naked in bed. On one such occasion, just prior to the date she struck him in the belly, she saw the child's penis erected while lying naked with the father, the latter stroking the boy's thigh. For whatever reasons, Walter's mother did nothing about restraining, reporting or rectifying the circumstances which clearly endangered and adversely affected her child's mental and physical health. Parents are not free to stand by as disinterested witnesses when such deleterious events materialize. It was the mother's obligation, both morally and legally, to intervene on Walter's behalf. *In re Holmes* (1975), 28 Ill. App. 3d 104, 106, 328 N.E.2d 35; *In re B.K.* (1984), 121 Ill. App. 3d 662, 665, 460 N.E.2d 43.

At the time of the events reported by Walter's mother, there were in effect sections 4 and 5.1 of the Wrongs to Children Act (Ill. Rev. Stat. 1989, ch. 23, pars. 2354, 2355.1) which, respectively, made it unlawful "for any person having the care or custody of any child, wil-

fully to cause *or permit* the life of such child to be endangered, or the health of such child to be injured," or for a parent or stepparent to *"knowingly allow[ ] or permit[ ]* an act of criminal sexual abuse or criminal sexual assault *** upon his or her child and fail[ ] to take reasonable steps to prevent its commission or future occurrences of such acts." (Emphasis added.) The voluntary statements made by Walter's mother to police demonstrated that she knew of and permitted the sexually abusive acts visited upon Walter, but did nothing about them. The greatest interest she mustered for the protection of Walter was to punch him in the stomach after one of the episodes, punishing the victim, as it appears. Clearly, she both knew of and permitted the endangerment to Walter. Under these circumstances, the statements given by Walter's mother were tantamount to admissions that she permitted the health of her child to be endangered and permitted acts of criminal sexual abuse upon her child in contravention of the foregoing protective statutes. Those admissions constituted substantive evidence to be considered by the court. (See, *e.g., People v. Bell* (1975), 27 Ill. App. 3d 171, 177, 326 N.E.2d 507; *Security Savings & Loan Association v. Commissioner of Savings & Loan Associations* (1979), 77 Ill. App. 3d 606, 396 N.E.2d 320; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §802.1, at 525-26 (4th ed. 1984).) When coupled with other evidence in the case, the mother's admissions supported much of Walter's version of events as given to the authorities. The mere entry in a hospital record, without more, that the mother "recanted her statements periodically," is entitled to little if any weight. See, *e.g., People v. Dotson* (1987), 163 Ill. App. 3d 419, 422-24, 516 N.E.2d 718.

Walter's own statements to the authorities exhibited every indicia of reliability and established that it was more likely than not that Walter was abused. When first seen by the police, Walter was standing in his kitchen crying hysterically. He told police "Mommie punched me." Walter later told police that he had "whistled on his daddy's pee-wee." He described whistling as "blowing" and pointed to his tongue. He reiterated that he had whistled on his father's "pee-wee" and that his dad had an accident in his mouth. The five-year old physically demonstrated how he masturbated his father's penis. Each police officer testified that Walter could understand and answer the questions they posed in the interviews.

Ms. Cash, the caseworker who had interviewed thousands of children, testified that, without prompting, Walter told her his mother hit him in the stomach with her fist and whipped him with a belt. He told her that his father "peed in his mouth." Walter stated that he did not

like taking showers with his father because his dad "messed with his peepee," "rubbed on his legs and on his back," and "put his pee-pee in"—and then pointed to his anus. When Walter talked about the abuse, he appeared sad, his head was down and he seemed depressed. He understood her questions and gave appropriate answers to them.

The medical records which were admitted into evidence also corroborated the conclusion that Walter was sexually and physically abused. The records reflect that when the medical professionals questioned Walter about sexual and physical abuse, his level of psychomotor agitation increased and he covered his face.

The circuit court noted that Walter gave several "different" versions of events. The record, however, reveals no contradictions with regard to the child's statements to the officers and caseworker. The court relied heavily upon the June 6, 1991, Mt. Sinai Hospital medical records in which five-year-old Walter denied the abuse. The record reflects Walter's inability to discuss the abuse. According to recognized authorities, Walter's behavior at Mt. Sinai Hospital was consistent with that of a sexually abused child who had been interviewed previously by several other persons. (See J. Myers, Child Witness Law & Practice §4.15, at 153-54 (1987); Summit, *The Child Sexual Abuse Accommodation Syndrome*, 7 Child Abuse and Neglect 177 (1983).) Also, Dr. Mason testified that he was not aware that Walter had already given three people very detailed descriptions of the abuse. He did not ask Walter about showering with his father, acts of oral copulation or similar behavior. Dr. Mason agreed that the boy's agitation and reluctance to discuss sexual abuse with hospital staff was not unusual for a child who had been sexually abused.

Circumstantial evidence also constitutes sufficient corroboration for a finding under the Juvenile Court Act. In *In re K.L.M.* (1986), 146 Ill. App. 3d 489, 496 N.E.2d 1262 (*K.L.M.*), which involved abusive touching, not oral copulation, the court relied upon evidence showing that: (a) the child was anxious, (b) the child had limited opportunity to have learned about the sexual matters which she described, (c) there had been no opportunity to arrange for the child to give false information, and (d) the child showed slight irritation in the genital area. This court recently found the reasoning in *K.L.M.* to be persuasive in *C.C. & R.C.*, in which one child's descriptions of the abuse and the observations of teachers, doctors and foster parents established that it was more likely than not that the father sexually abused his children.

Many factors relied upon by the appellate court in *K.L.M.* are present here. In this case, each time Walter was interviewed, he

would become anxious when discussing the sexual abuse. He would lower his head, look away and cross his arms. At LaRabida Hospital, he refused to discuss any topic relating to body parts. When Dr. Mason of Mt. Sinai questioned Walter, he became agitated when the topic of sexual abuse arose. Acts of oral copulation, such as described by Walter, are not susceptible to physical evidence.

Walter provided a vivid description of oral copulation, including references to an unpleasant liquid in his mouth. Walter stated that he had whistled on his father's "pee-wee," and that his father had an accident in his mouth. Walter also demonstrated detailed knowledge of masturbation. It is very unlikely, at his age, that Walter could have fabricated these descriptions or graphically demonstrated the manner in which he masturbated his father's penis, if he had not been taught to do it. There is no evidence that Walter was coached or coaxed into making statements describing the sexual abuse. Rather, the record demonstrates that the boy's statements were entirely spontaneous. It is inconceivable that this five-year-old child could duplicate the agitated behavior of a sexually abused child in interviews.

Accordingly, the circuit court's finding of unproved sexual abuse is against the manifest weight of the evidence and must be reversed and the cause remanded for further proceedings.

## II

The guardian asserts that the circuit court's finding as to unproved neglect of care necessary to Walter's well-being (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(1)(a)) also was against the manifest weight of the evidence. The court expressly stated that under the circumstances, the mother's comments, indicating she did not want anything more to do with the child, did not constitute neglect of necessary care.

Neglect is generally viewed as the failure to exercise the care that circumstances justly demand and encompasses both willful and unintentional disregard of parental duty. (*In re B.T.* (1990), 204 Ill. App. 3d 277, 280, 561 N.E.2d 1269.) It is not, however, fixed in definition and takes its meaning from the specific circumstances of each case. *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 104 N.E.2d 769.

■ In the present case, the mother left the police station without Walter. She announced that she wanted no part of the child. She simply walked away from him and told the police to do what they wanted with Walter. Implicit in these acts and statements is her expressed intention not to care for Walter or to attend to his needs.

The circuit court's finding as to this issue was contrary to the manifest weight of the evidence and must be reversed and remanded for further proceedings.

## III

The guardian maintains that the circuit court erred when it found that neglect in the environment injurious to Walter's welfare was not proved. (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(1)(b).) The issue raised is whether this statute was violated by the father having had sexual contact with Walter, his mother punching him for such conduct, and his mother leaving him at the police station and refusing to take him home.

Leaving a child in a sexually and physically abusive environment constitutes neglect in the environment. *In re Carlenn H.* (1989), 186 Ill. App. 3d 535, 540, 542 N.E.2d 959; *In re Weber* (1989), 181 Ill. App. 3d 702, 537 N.E.2d 428.

As previously observed, parents have the duty to protect their children from harm. (*In re Holmes* (1975), 28 Ill. App. 3d 104, 106, 328 N.E.2d 35; *In re B.K.* (1984), 121 Ill. App. 3d 662, 665, 460 N.E.2d 43.) Their refusal to provide their children with safe and nurturing shelter, as in the case *sub judice*, clearly falls within the concept of statutory neglect. The circuit court's finding that neglect in the environment was not proved was against the manifest weight of the evidence and must be reversed and remanded for further proceedings.

## IV

The final error identified by the guardian is the circuit court's dismissal of the physical abuse count (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(2)(i)). The physical abuse is claimed to have been demonstrated by Walter's statements to police that his mother punched him in the stomach; Walter's statement to Dr. Mason that his mother punched him; Dr. Mason's opinion of probable physical abuse by the mother; and Walter's statement of physical abuse given to Ms. Cash. It is urged that the hearsay statements as related by Officer Linder, Dr. Mason and Ms. Cash are corroborated by the mother's admission that she hit him the day the police arrived at Walter's home, and by Officer Linder's observation of Walter crying upon initial contact. It is urged that the foregoing constitutes sufficient evidence under section 2—18(4)(c) to find abuse and, therefore, the court's finding was against the manifest weight of the evidence. We agree.

■ The circuit court, after examining the statements attributed to Walter, concluded they were not corroborated as required by section 2—18(4)(c), reasoning the evidence was insufficient to support a finding of physical abuse. The court, which expressly asserted it did not condone physical punishment, apparently required corroboration that the mother hit Walter often, distinguishing this from a single incident of hitting which the court did find was corroborated by the mother's admission. It must be noted that the hospital records speak in terms of "a history" of abuse, as well as the fact that Walter told Ms. Cash his mother hit him more than once. Coupled with Officer Linder's firsthand observations at Walter's home, the father's accusation that the mother punched Walter, and her admission of this fact, it is difficult to see how this behavior could have been discounted by the court. The primary consideration here is the best interests of Walter and his welfare. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 339, 379 N.E.2d 872.) That being so, a court need not and should not wait for repetitious behavior deleterious to a child's well-being before taking ameliorative and prophylactic action. (See *In re A.D.R.* (1989), 186 Ill. App. 3d 386, 393-94, 542 N.E.2d 487.) The circuit court's finding of unproved physical abuse, under all the circumstances of this case, was against the manifest weight of the evidence and must be reversed and remanded for further proceedings.

Our extensive review of all the record evidence requires that the circuit court findings of unproved charges were against the manifest weight of the evidence and are reversed. The cause is remanded with instructions to restore custodial care of Walter to the Department of Children and Family Services until such time as the appropriate authorities are satisfied that his home environment has been corrected satisfactorily or take such other action as may be necessary.

Reversed and remanded with directions.

SCARIANO and McCORMICK, JJ., concur.