*In re* T.L. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellant, v. Daniel Lubben *et al.*, Respondents-Appellees).

Fourth District   No. 4—92—0213

Argued June 11, 1993.—Opinion filed December 16, 1993. -

Thomas J. Difanis, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Kristen H. Fischer, of Urbana, for appellees.

David A. Fernandes, of Urbana, guardian *ad litem*.

JUSTICE STEIGMANN delivered the opinion of the court:

In November 1991, the State filed a supplemental petition for adjudication of wardship of T.L. and her siblings. The petition alleged T.L. was sexually abused by her parents, respondents Daniel and Samantha Lubben. After conducting hearings, the trial court dismissed the supplemental petition. The State appeals, arguing that the trial court erred in applying certain case law in dismissing the petition.

We reverse and remand.

I. BACKGROUND

In October 1990, the State filed a petition for adjudication of wardship, alleging respondents abused and neglected T.L., their 3½-year-old daughter, and her two younger siblings. In November 1990, respondents admitted and stipulated to the neglect allegation, and the court adjudicated T.L. and her siblings wards of the court. In December 1990, the court appointed the Department of Children and Family Services (DCFS) guardian of the children with power to place them away from respondents' residence. In November 1991, the State filed a supplemental petition for adjudication of wardship, alleging in part that Daniel placed his penis in T.L.'s mouth and anus. In February and March 1992, the trial court held hearings on the petition.

During the hearings, the court received testimony from several witnesses, including T.L., her foster mother, two Urbana police officers, T.L.'s social worker, a pediatrician specializing in sexual abuse, and a DCFS caseworker. T.L.'s foster mother, Judy Brooks, testified that DCFS placed T.L. with her almost a year and a half earlier. During this time, T.L. displayed self-abusive behavior, including slapping herself in the head and biting her hands, fingers, arms, legs, and lips. Instead of sleeping in her bed, T.L. insisted on lying in the doorway, her head resting in the hall outside her bedroom. Furthermore, T.L. engaged in sexual exploration with other children, often showing herself to a boy and asking him to put his "thingy into hers." Also, T.L. ripped holes in the crotch of her pants, masturbating at home and in public.

Brooks testified about a conversation she had with T.L. about a "mouse game." The mouse would come into T.L.'s bedroom at night and lock the door. It then put gum on a stick and placed it in her mouth and bottom. T.L. insisted the stick was not from outside, but that it was the mouse's stick. T.L. indicated that her face and bottom would get sticky, and her eyes would hurt. T.L. told Brooks that the stick is the mouse's "thingy." Later in the conversation, T.L. said the mouse was "Danny." She also indicated that "Sam" bit her on the hand and "private parts" when the mouse game was played. T.L. explained that she did not want to stay in her bedroom because Danny comes there in the dark and hurts her.

T.L. also told Brooks that "thems" were going to hurt Brooks. T.L. then indicated that Sam and Danny did not like Brooks and were going to hurt her. T.L. also said that she had to be nice or they would hurt her, too.

T.L. testified during an in-chambers examination. She shook her head when first asked if either a boy or girl doll had a "thingy," but put her hand down the boy doll's pants when asked again. T.L. nodded her head affirmatively when asked if she played the mouse game with Danny. In describing the game, T.L. placed her finger in her mouth and bit it, stating "that's what Danny did to me." She indicated that Danny put a stick with gum on it in her mouth. T.L. then refused to answer further questions, and the court ended her testimony.

Officer Patrick Connolly, a juvenile officer with the Urbana police department, testified that although generally unresponsive, T.L. stated to him that Danny put a stick with gum on it in her eye. She also said that Danny would hurt her again if she said anything. Connolly also testified regarding a conversation he had with Samantha. After informing her that T.L. had identified Daniel as sexually abusing her, Samantha stated that although she did not want to believe that charge, she in fact did believe that he sexually molested T.L. while he was under the influence of drugs.

Deanna McNaught, a social worker doing therapy work with T.L., testified that T.L. told her that a mouse named Danny came into her room at night with a stick of gum and woke her. T.L. described the stick as a "thingy," stating that the mouse would put it in her mouth. When asked if the mouse put the stick anyplace else, T.L. said she was afraid to tell; however, she later said that the mouse put it in her private parts at her bottom. T.L. indicated that the mouse came into her bedroom when she lived with Daniel and Samantha. McNaught also provided her expert opinion that T.L.'s behavior was consistent with that of a victim of sexual abuse.

Dr. M. Kathleen Buetow, a pediatrician, testified that during an interview, T.L. took boy and girl "anatomically correct" dolls to a corner of the room to play. After undressing both, she placed the boy's penis in the girl's vagina. T.L. told Dr. Buetow that she played the mouse game with both Daniel and Samantha, and she indicated where they touched her by pointing to her vaginal area. She then grabbed the boy doll's penis, calling it a "thingy." When asked where Danny touched her with the "thingy," she pointed to the girl doll's vaginal area, its anal area, and her mouth. She stated that he touched her inside.

After the hearings, the court found that T.L. had been severely sexually abused. However, stating that it was bound by *In re Custody of Brunken* (1985), 139 Ill. App. 3d 232, 487 N.E.2d 397, it

ruled against the State on its petition. In making its findings, the trial court stated the following:

"I am persuaded, frankly beyond purview, that this child was sexually abused. This child started saying things about the mouse game and the gum on the stick and everything else long before the child ever saw Dr. Buetow, long before there was any suggestion to her that could remotely, remotely suggest in that little mind anything about sexual abuse.

*** And I would note that this child exhibited all of [the behaviors, signs, and symptoms of sexual abuse]. Not one. Not two. Not three, but all of them.

*** I've sat here or in a similar position in other court-rooms for over nine years, and I have seen a lot of children and I have watched a lot of behavior. This child has almost lost her identity completely. [T.L.] has almost ceased to exist. She is a mass of defenses. She's been so deeply and pro-foundly, and perhaps permanently, emotionally scarred that she's replaced her own personality with her defenses. *** And, frankly, judicial decisions about whether or not it was sexual abuse become pretty irrelevant and shrink in impor-tance.

I will not spend a great deal of time and belabor the record talking about why it is I'm persuaded she's been sexually abused, because what I'm convinced of and what I am al-lowed by the law to find are two different things. There is a case directly on point that governs the decision before me to-day I believe. That case is [*Brunken*]. ***

\* \* \*

I will be so presumptuous to say I disagree as profoundly and as I [*sic*] strongly as I can with the reasoning of the court in *Brunken*.

\* \* \*

*** [However,] it is incumbent upon the [trial] judge to fol-low any and all decisions of the appellate court whether or not that judge agrees with them and whether or not that judge feels they were correctly decided ***.

*** [*Brunken*] is binding upon me and controls my decision in this case. And I believe I have no alternative but to find against the State and order that the supplemental petition be dismissed.

I would invite the State to appeal that decision. *** However, I feel controlled in this case by the *Brunken* precedent."

## II. ANALYSIS

In an effort to meet the pervasive and unique problem of child sexual abuse, the legislature enacted section 2—18(4)(c) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2—18(4)(c) (West 1992)) to provide that a victim's assertions of abuse or neglect are inherently reliable. (*In re Walter B.* (1992), 227 Ill. App. 3d 746, 751-52, 592 N.E.2d 274, 278.) The Act requires, however, that a child's out-of-court statements be corroborated by other evidence. (*Walter B.*, 227 Ill. App. 3d at 752, 592 N.E.2d at 278.) This evidence can be either direct or circumstantial. *Walter B.*, 227 Ill. App. 3d at 754, 592 N.E.2d at 280.

In *Brunken*, a decision of the Fifth District Appellate Court, allegations of sexual abuse arose during a visitation dispute between the child's parents. The mother and maternal grandmother testified about the child's out-of-court statements which had indicated abuse by the father. A DCFS social worker and child counselor also testified about the child's statements that indicated abuse by the father. Last, the State presented expert testimony of a psychologist, describing the general behavior of abused children. The child involved in *Brunken* had demonstrated some of those behaviors. The father denied the abuse, and the child did not testify. *Brunken*, 139 Ill. App. 3d at 235-38, 487 N.E.2d at 399-400.

Most of the analysis of the *Brunken* court focused on section 4—6(4)(c) of the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 704—6(4)(c)), which the legislature has since recodified as section 2—18(4)(c) of the Act without making any changes in that section. Both in 1983 and now, that section reads as follows:

"Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." Ill. Rev. Stat. 1983, ch. 37, par. 704—6(4)(c) (now 705 ILCS 405/2—18(4)(c) (West 1992)).

The court in *Brunken* based its holding on its examination of this corroboration requirement. It discussed each witness' testimony and rejected the State's argument that "two or more witnesses' testimony as to what the child said renders it more probable that

the matters allegedly asserted by [the child] were true." (*Brunken*, 139 Ill. App. 3d at 239, 487 N.E.2d at 401.) The court concluded that "the four witnesses who testified as to [the child's] alleged statements cannot be deemed to have corroborated each other." *Brunken*, 139 Ill. App. 3d at 239, 487 N.E.2d at 402.

Also noting the parents' conflict over visitation, the court found that the mother had a motive to fabricate allegations of the father's abuse. Therefore, the court held that "in view of [the father's] adamant denials and his contention that the proceedings are [the mother's] attempt to interfere with visitation, corroboration from [the mother's] mouth and [from the maternal grandmother's mouth] must be deemed inferior to corroboration from any independent source." *Brunken*, 139 Ill. App. 3d at 240, 487 N.E.2d at 402.

The respondents here argue that the trial court correctly analyzed the evidence and applied the applicable law to it. They contend that *Brunken* is controlling and the trial court therefore did not err in applying it.

The State argues that *Brunken* has been limited by subsequent opinions of the appellate court and urges us to distinguish it based upon factual difference between *Brunken* and this case. We agree with the State's characterization of *Brunken* and conclude that it did not require the trial court's action here of dismissing the State's petition.

In *In re C.C.* (1991), 224 Ill. App. 3d 207, 215, 586 N.E.2d 498, 504, the First District Appellate Court addressed a similar argument that, based upon *Brunken*, the evidence was not sufficient to show that the children in that case had been sexually abused by their father. The court in *C.C.* distinguished *Brunken*, explaining as follows:

"[W]e find this case distinguishable because the allegations of abuse there arose from a visitation dispute between the parents and the mother had a motive to fabricate allegations of sexual abuse by the father. Here, there is no evidence to indicate that any of the caseworkers, teachers or doctors who testified had the motive or opportunity to arrange for the minors to give false testimony just as there is no evidence of any sort that either boy had a reason to fabricate such a story. Furthermore, in *Brunken*, the State presented as corroborative evidence the expert testimony of a psychologist who stated that he had never examined or interviewed the child in question. His testimony consisted of generalities concerning other children that he had examined and their typical

behavior. In the instant case, the expert testimony of [the treating pediatrician] was based on five days of observation, interviews and testing of the two children." *C.C.*, 224 Ill. App. 3d at 215, 586 N.E.2d at 504.

We agree with the above analysis and find that the same distinguishing features present in *C.C.* are also present in the instant case. Here, T.L. testified, as did Dr. Buetow. She based her testimony upon her personal interview of T.L. (as opposed to the expert in *Brunken* who neither spoke to nor even saw the child involved). Further, the *Brunken* court put great weight on motives present in that case for fabricating the allegations against the father; this record contains no suggestion of any such motives on behalf of any of the people who spoke to (or had access to) T.L. In sum, the concerns which account for the holding in *Brunken* are not present in the instant case, and we decline to apply that holding in their absence.

The trial court, as trier of fact, found that T.L. was sexually abused. However, the court viewed *Brunken* as an obstacle—indeed, the *only* obstacle—to the court's granting the State's supplemental petition for adjudication of wardship. In light of our rejection of *Brunken*'s application to the facts of this case, the trial court on remand is now free to do what it believed appropriate based upon its finding of the facts—grant the supplemental petition.

### III. Conclusion

For the reasons stated, we reverse the judgment dismissing the State's supplemental petition and remand for further proceedings.

Reversed and remanded.

McCULLOUGH, P.J., and GREEN J., concur.