627 N.E.2d 1178 (1994)
255 Ill. App.3d 768
194 Ill.Dec. 536
In re N.S., a minor. (The PEOPLE of the State of ILLINOIS, Petitioner-Appellee, v. Teresa Smith, Respondent-Appellant).
No. 4-93-0165.
Appellate Court of Illinois, Fourth District.
January 13, 1994.
*1179 Robert E. McIntire, Public Defender, William S. Sohn, Asst. Public Defender, Danville, for respondent-appellant.
Barbara L. Delanois, Danville, Guardianad Litem.
Roy G. Wilcox, Hutton, Laury, Hesser, Lietz & Wilcox, Craig H. DeArmond, State's Atty., Danville, Norbert J. Goetten, Director, State's Attorneys Appellate Prosecutor, Springfield, Robert J. Biderman, Deputy Director, Rebecca L. White, Staff Atty., for petitioner-appellee.
Justice LUND delivered the opinion of the court:
This opinion illustrates the nightmarish problems faced by trial courts when determining child abuse cases.
Respondent Teresa Smith appeals from an order of the circuit court of Vermilion County adjudging her daughter N.S. an abused minor under section 2-3(2)(iii) of the Juvenile Court Act of 1987 (Act) (Ill.Rev.Stat.1991, ch. 37, par. 802-3(2)(iii)) and placing her in the custody of her natural father, Edward Smith. We affirm.
On August 3, 1992, a petition for adjudication of wardship was filed by the Illinois Department of Children and Family Services (DCFS), alleging that four-year-old N.S. had been sexually abused by respondent. It was alleged that on three occasions in July 1992 respondent had placed her finger in the vagina of N.S., fondled the child's vagina, and touched it with her mouth.
N.S. was taken into protective custody. At a shelter-care hearing, evidence showed that N.S. had told investigators her mother had placed her finger in her "pooty," a word N.S. used to indicate her vagina. She also said respondent had kissed her vagina. DCFS was appointed temporary guardian, and the minor was placed in the physical custody of Edward, a resident of Virginia, as long as he resided in Vermilion County, Illinois. DCFS eventually placed N.S. in the home of her paternal aunt, Lori Redmon, who resided in Westville.

ADJUDICATORY HEARING EVIDENCE
N.S. was examined in camera and questioned by four attorneys and the trial judge. She testified that respondent had put her finger inside her vagina and put her mouth on her vagina at night when she was asleep in her bedroom. Each time it lasted for about five minutes, and occurred on different occasions. Her mother told her not to tell anyone about it. When asked whether the incidents happened a long time ago or just recently, N.S. at first said long ago, then *1180 stated it had just happened. She stated that it hurt when respondent put her finger inside her vagina. N.S. was with Edward for visitation for five days, and she told him what respondent had done. No one told her to accuse her mother. Edward, her aunt, and grandmother told her to tell the truth. She wants to live with Edward.
N.S. testified Edward bought her a white pony, then she changed it to a unicorn. She rides it on the road by herself to restaurants. She went to the Ponderosa restaurant with it. Sometimes the unicorn gets hit by cars, but it is not killed. In response to questioning, N.S. said she was tired of talking about the incidents with her mother and that was why she was talking about a unicorn. She stated she told Linda (a DCFS worker) that her mother had done it. She insisted she had a unicorn and that she rode it to the Ponderosa. When the trial judge asked her how many times respondent had done this to her, N.S. answered, "Five and six and seven and eight and nine and twelve and thirteen and fourteen." She also said she told what respondent had done so that she could go live with Edward.
Steve Wilson, a juvenile investigator for the City of Danville, testified that he spoke with N.S. on July 27, 1992. N.S. told him respondent had come into her bedroom while N.S. was asleep, undressed her, and placed her finger way up in her vagina. She told him she told respondent it hurt and to stop and, if she did not stop, N.S. would run away. Respondent did not stop. N.S. told him this had happened on several occasions. She also told him respondent had kissed N.S.' vagina. He felt N.S. could distinguish between truth and falsity, and he found her believable. N.S. did not get upset, and she was writing and drawing as Wilson talked with her. She said no one told her to say these things.
Linda Jacques, a child protective investigator for DCFS, testified that she spoke with N.S. on July 28, 1992. N.S. knew what her private parts were and knew the difference between good and bad touches. N.S. told her respondent had put her finger in her vagina and wiggled it around and had kissed her vagina. She said the last time it happened was the night before. However, Jacques was aware that N.S. had been with Edward that night.
Jacques testified that respondent has four children. She is living with Charles Lovett, father of three of them. In 1989, DCFS was involved with the family because of respondent's failure to keep medical appointments for N.S. In May 1992, the public health nurse attempted to visit the family and was not allowed in the house. When she was allowed entrance on her third visit, she found respondent's baby, A.S., needed medical attention. When they arrived at the hospital with her, the doctor said that the baby would have died in a matter of days without medical attention. Respondent was offered parenting assistance, transportation to appointments, financial assistance, and counseling. Cooperation from the family was minimal. After her conversation with N.S., she spoke to respondent, who denied N.S.' allegations. N.S. was examined by a doctor, but no evidence of sexual abuse was found.
Ellen Wenrick, a marriage and family therapist for Catholic Social Services, testified that she has met with N.S. two times since the report of abuse. N.S. brought up the incidents in a matter-of-fact manner. She was playing with leggos at the time and continued to play while she talked. The second time she saw N.S. was only for about 10 minutes, and they did not discuss the incidents.
Edward testified that he has resided for the last year in Virginia Beach, Virginia, and is in the United States Navy. He had custody of N.S. prior to entering the Navy and, when entering, he turned over custody to respondent because he could not get into the Navy with dependents. In July 1992, he picked N.S. up from respondent's house for a visit at his sister's house in Westville. N.S. was to stay with him for one week, the duration of his leave. About the second or third day of the visit, after they had been swimming at his mother's house, N.S. started rubbing herself and said her "pooty" hurt. When he asked her why, N.S. said because respondent touches her there. She said respondent had several times come into her room while she was asleep and pulled N.S.' pants down and stuck her finger inside N.S.' *1181 vagina. She illustrated by pulling aside her bathing suit and sticking her finger up inside her vagina. N.S. repeated the story to Edward's brother, mother, and sister, and began acting upset. They called the police. Before this, N.S. had never said this about her mother or any other person. N.S. said it had happened the day before, but she was with him that night He does not think N.S. understands the concept of time. He has a son who resides in Virginia with him. Edward testified he did not tell N.S. to say these things about respondent, and he has only told N.S. to tell the truth, whatever that is. He has filed a petition for custody of N.S.
Linda Lucas, a caseworker for Catholic Social Services, testified that on September 14, 1992, she was monitoring a visit between N.S. and respondent. Both were in her sight at all times. Respondent was not to discuss the case with N.S. N.S. was playing with puzzles and wanted respondent to help her. Then N.S. said, without any prompting, "Dad made me say it." Respondent asked her what Edward had made her say and N.S. replied that he had made her say respondent had put her finger in N.S.' vagina. Lucas told N.S. she was free to say what was true, and N.S. said she could not because she had already told the story to the judge. She told N.S. it was never too late to tell the truth. The conversation was then ended, because N.S. became nervous and shaky. She also monitored a visit on August 12, 1992, which went very well. N.S. appeared to be comfortable with her mother. N.S. asked to use the rest room and Lucas started to take her, but N.S. said she wanted respondent to take her.
Lucas also testified that at a visit on September 21,1992, respondent asked N.S. what Edward had said to make her accuse respondent, and N.S. answered that he had told her to do it. She then volunteered the information that Edward had abused her at her Aunt Julie's and Uncle Ben's house and had told her to say that respondent did it. N.S. further stated that her aunt and uncle had left the house and Edward had taken her into a bedroom and had stuck his finger in her vagina, and that she told him no, but he continued. At no time during the visits did N.S. say respondent had done anything to her. Later that day, she and N.S. were alone in the car as she was taking N.S. home after the visitation. She again urged N.S. not to be afraid to tell the truth, and N.S. replied that she was telling the truthrespondent had not touched her. N.S. asked her not to tell her Aunt Lori about their conversation. N.S. was always happy to see her mother, and she would hug and kiss her. Lucas filed an incident report after hearing N.S. tell of abuse by Edward.
Respondent testified and denied ever touching N.S.' vagina with her hand or mouth or putting her finger inside it. The reason she did not keep N.S.' medical appointments in 1989 was because N.S. had a cold and asthma and could not get her shots with those conditions. A doctor had told her this and said to wait until she was better and had finished her medication. She denied refusing to allow the nurse to see A.S. She did not know her baby was ill in 1992 when the public health nurse came. She had taken her to the emergency room about a week before the nurse's visit, and the doctor said there was nothing wrong with hershe had a cold. As to the September 14, 1992, visit, N.S. told her that Edward said if N.S. did not say what he wanted her to, he would hurt her and respondent. N.S. refers to Charles Lovett sometimes as daddy and sometimes Charlie. She refers to Edward as dad or Ed. She knows that N.S. was referring to Edward when she made allegations at the visitation because she referred to him as dad. N.S. sleeps upstairs at her house, and respondent sleeps downstairs with her twoyear-old daughter. If N.S. has nightmares, she will sometimes go downstairs to sleep with respondent. Respondent denied telling N.S. during any of the breaks from court to say that she did not do anything to N.S. Respondent testified she used to collect unicorns and still has two of them in her house.
Lori Redmon, Edward's sister, testified that N.S. had told her three or four times of being abused. N.S. told her that respondent said to N.S. that respondent did nothing and that N.S. could not understand this because she knew respondent did it. Her brother was not alone with N.S. for any extended *1182 periods of time during his visitation with her. He stayed at her house during that time. N.S. has never indicated a problem with Edward. They have a good relationship.
Edward testified and denied threatening N.S. or respondent if N.S. did not accuse respondent of abuse. He also denied being alone in his brother Ben's house with N.S.
Jeanne Burke, a child protection supervisor for DCFS, testified that the 1989 investigation involved not only failing to get immunizations for N.S., but also failing to get treatment for N.S.' asthma and have her treated for human bites she had received. DCFS investigated the allegations of sexual abuse allegedly made by N.S. against Edward. The report was deemed unfounded.
The court ordered a psychological evaluation of N.S. In a report filed with the court, Marty Traver, a licensed clinical psychologist, found N.S. to be evasive and anxious throughout the evaluation, refusing to answer questions or cooperate in tasks which most children would find enjoyable. She found it more difficult to evaluate N.S. because she had been subjected to the "system's influences," and the nature of the questions previously asked of her had created anxiety and conflict in her. She found N.S. to be an anxious and unhappy child, and concluded the following regarding N.S.:
(1) She has average intellectual functioning. She resisted talking about the sexual abuse because of prior extensive questioning to which she had been subjected.
(2) N.S. could easily differentiate between truth and falsity.
(3) Her thought processes were normal, with no delusions or psychosis.
(4) N.S. does not tend to fantasize or hallucinate. She is preoccupied with sexual matters and kissing, which indicates some environmental influences.
(5) She has an impaired memory of remote events. She could not place the alleged sexual abuse in a time context, except to guess that it happened five or seven times.
(6) N.S. could be coached or coerced to tell a story, but would not be likely to repeat it consistently as often as she has done.
(7) N.S. appears to have been sexually abused. As Traver had not evaluated respondent, she had to take N.S.' word for who had done the abusing.
(8) N.S. would not be a credible witness for criminal prosecution. She has other problems not related to the abuse, and she should receive counseling for all her problemsnot just those relating to the abuse. It is a matter of concern that N.S. shows no emotional feeling for either respondent or Edward.
The court found N.S. to be a competent and credible witness, based upon her repetition of the story in much the same fashion several times. The court found N.S. to be an abused minor and adjudged her a ward of the court. Temporary custody was continued with DCFS, pending the dispositional hearing.
Catholic Social Services prepared a report for purposes of the dispositional hearing. At that hearing, the State asked the court to adopt recommendations of the report. The report noted respondent had refused counseling directed toward return of N.S. to her home and that Edward was being deployed in March 1993 for a nine-month tour of active duty. It noted that visits in August and September 1992 between N.S. and respondent went well, with N.S. spontaneously showing affection for respondent. It also noted respondent would question N.S. about why she let Edward talk her into lying about respondent. She would also tell N.S. that if she loved respondent she would tell the truth, i.e., that respondent did nothing to N.S. During the visits in October, November, and December 1992, interaction between N.S. and respondent decreased. N.S. kept her distance from respondent and had to be asked to give her hugs and kisses. Respondent continued to discuss the abuse allegations in front of N.S. N.S. reported to a caseworker that she gets nervous when she sees respondent. The report recommended that N.S. continue in her placement with her paternal aunt, at least until Edward returns from active duty.

*1183 DISPOSITION HEARING EVIDENCE (FEBRUARY 1993)
Lori Redmon testified she has observed a very close relationship between N.S. and Edward. N.S. has expressed a desire to live with Edward.
Edward testified that he wants custody of N.S. He was hospitalized at his own request for depression in 1989 over the breakup of his marriage. Respondent had one child by Charles Lovett while married to Edward and was pregnant with another when they split up. He is remarried and has one child by that marriage. His wife's three daughters also live with them. His wife has known N.S. since before their marriage, and the two of them get along pretty well. When he agreed to give custody of N.S. back to respondent prior to going into the military, she had promised to stop using drugs. She primarily used marijuana. For the first four years he is in the military, he is on sea duty. He deploys for six months. He then would have the remainder of the year and the next year off. He might be deployed once every two years. Then when he reenlists, he would get shore duty and not be deployed at all for that four-year period. He is now into his second deployment period. He anticipates being able to stay in the Virginia Beach area for at least the next 10 years, due to a new program the Navy has for personnel who have dependents. N.S. would share a bedroom with one of his stepdaughters, whose ages are three, five and seven. He has four bedrooms in his home. He has already talked to psychologists who are willing to treat N.S. and his insurance would pay for it.
Respondent testified that she is 28 years old and has been receiving supplemental security income (SSI) since she was 18 years old. She does not know exactly why she is receiving the benefits. Her mother took care of it. She does have a learning disability. She refuses to seek counseling for something she did not do. After her separation from Edward but before the divorce, she allowed him to take N.S. for visitation, but he refused to return her.
Each time she has visited N.S. since this proceeding, N.S. has hugged and kissed her and they have played together. She denied any lack of interaction between the two.
Respondent testified that Edward was violent two or three times during the two years they were married. They were married for two years. He would throw things. He did not direct any violence toward her or another person.
Marilyn Stonebreaker, respondent's mother, testified that she has accompanied respondent to visitation with N.S. and has noticed that N.S. has been very withdrawn at the beginning of the visits. She does not know whether the cause is N.S.' therapy or the trauma she has gone through. Respondent has learning disabilities and she has asthma. Stonebreaker filed a guardianship proceeding in 1987, asking that a guardian be appointed for respondent's person and estate because respondent was a spendthrift and was mentally disabled.
At the conclusion of the hearing, the court noted that normally it follows the recommendations of Catholic Social Services as to placement of the child. However, it noted that evidence had been presented at the hearing which the authors of the report did not have when they made their recommendations. The court ordered N.S. to be placed in Edward's custody. It indicated that the distance between Virginia and Vermilion County was a concern, but that N.S. needed to begin to establish a more stable life than she had had previously and that Edward was a fit parent to have her custody. DCFS was discharged as guardian, but was ordered to transfer the case to its sister agency in Virginia so the case could continue to be monitored. Edward was ordered to seek immediate counseling for N.S. Reasonable supervised visitation for respondent was to be left to the discretion of DCFS. Edward was further ordered to bring N.S. back himself at least once per year for visitation and to cooperate with DCFS as to whatever other visitation it might arrange.
On appeal, respondent first argues the court abused its discretion in finding N.S. to be an abused minor. She contends N.S.' statements regarding respondent's sexual abuse are not sufficient to support the court's finding because (1) the story told in the *1184 judge's chambers about riding a unicorn to the Ponderosa restaurant in Danville shows N.S. could not distinguish fact from fantasy; and (2) N.S. two times gave contradictory statements to respondent and Linda Lucas, stating that Edward had forced her to lie about respondent's actions and that respondent did not abuse her.
A finding of abuse or neglect by a trial court will not be disturbed on review unless it is against the manifest weight of the evidence. In re C.C. (1991), 224 Ill.App.3d 207, 215, 166 Ill.Dec. 540, 546, 586 N.E.2d 498, 504.
In a proceeding under the Act for adjudication of abused, neglected, or dependent minors, allegations of the petition must be proved by a preponderance of the evidence (see Ill.Rev.Stat.1991, ch. 37, par. 802-18(1)), and the primary consideration in such cases is the best interest and welfare of the child. (In re Simmons (1984), 127 Ill.App.3d 943, 948, 82 Ill.Dec. 681, 685, 469 N.E.2d 215, 219.) There is a rebuttable presumption that a minor is competent to testify in such proceedings. The court must determine how much weight to give the minor's testimony. Ill.Rev.Stat.1991, ch. 37, par. 802-18(4)(d).
The Act also provides that previous statements made by a minor relating to allegations of abuse or neglect are admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, is sufficient in itself to support a finding of abuse or neglect. Ill.Rev.Stat. 1991, ch. 37, par. 802-18(4)(c).
Here, respondent admits that statements of N.S. regarding respondent's abuse of her were corroborated by N.S.' trial testimony in the judge's chambers, where she was questioned at length by counsel for all concerned and the guardian ad litem. This fulfills the statutory requirements to make the statements admissible. (See In re Marcus E. (1989), 183 Ill.App.3d 693, 704, 132 Ill.Dec. 34, 41, 539 N.E.2d 344, 351.) As the court stated in Marcus, there is no requirement that a child's trial testimony be corroborated or be clear and convincing. (Marcus, 183 Ill.App.3d at 705, 132 Ill.Dec. at 42, 539 N.E.2d at 352; see also In re T.H. (1986), 148 Ill.App.3d 877, 881, 102 Ill.Dec. 208, 211, 499 N.E.2d 988, 991.) In addition, we note those to whom N.S. had given her previous statements testified and were subject to cross-examination.
Respondent's real complaint appears to be with the reliability of N.S.' statements and her trial testimony, based upon her story about the unicorn and the inconsistent statements made to respondent and Linda Lucas. The record shows that the accusations made by N.S. against Edward were investigated by DCFS and deemed unfounded. The record also shows that despite being instructed not to discuss the abuse allegations with N.S. at visitations, respondent persisted in doing so. It is entirely possible that her own actions prompted N.S. to state that Edward forced her to make the accusations and that they were not true. The report by Catholic Social Services to the court stated that respondent would ask N.S. if she loved her and, when N.S. said yes, respondent would tell her that if that was so, N.S. would tell the truth. Respondent apparently did this during the August and September 1992 visits. It is unclear whether these statements preceded N.S.' spontaneous statements that Edward had made her accuse respondent. In any event, we note Dr. Traver stated that N.S. could be coerced to tell a story, but she would not be likely to repeat the story so consistently as many times as she had. We do not find the trial court's resolution of this conflicting evidence to be manifestly unreasonable.
Respondent places emphasis on the story told by N.S. during her trial testimony about having a unicorn and riding it various places. She believes this demonstrates N.S.' inability to distinguish between fantasy and reality. We note the trial court's apparent concern with this question prompted an order for evaluation of N.S. by a psychologist. The psychologist found that N.S. could easily distinguish between truth and falsity, her thought processes were normal and she did not tend to fantasize. While the psychologist found that N.S. would not be a credible witness in a criminal prosecution, that determination has no bearing on this case. This was in the nature of a civil proceeding, where *1185 the burden of proof is less than in a criminal case and in which respondent's liberty was not at issue.
We will not substitute our judgment for that of the trial court, where there was an opportunity to observe N.S. while she testified, an advantage we do not have. (See In re S.M. (1988), 171 Ill.App.3d 361, 365, 121 Ill.Dec. 507, 510, 525 N.E.2d 565, 568.) Despite her story about the unicorn, N.S. consistently told the same story of respondent's abuse to her relatives, police, DCFS workers, and the court. The trial court did not err in finding N.S. a credible witness or in finding the State had proved the allegations of abuse against respondent by a preponderance of the evidence.
Respondent's second argument is that the court erred in awarding custody of N.S. to Edward and allowing him to remove her to his home in Virginia. Without citation to authority, respondent's one-paragraph argument on this issue contends that the court should have accepted the recommendation of Catholic Social Services that N.S. remain in foster-care placement with her paternal aunt. Respondent argues the court abused its discretion in allowing N.S.' removal from counseling and the support she had known and placing her with a new family.
As previously noted, the primary consideration in cases such as this is the best interest and welfare of the child. Although granting custody of N.S. to Edward required that she move a great distance from respondent and her family, it is inaccurate to say that N.S. would thereby be deprived of all counseling and support. The court ordered Edward to continue counseling for N.S. Edward testified he had found psychologists willing to treat her. The court also ordered N.S.' case to continue to be monitored by child-welfare authorities in Virginia. Edward testified he expected to be at his current residence for at least the next 10 years. He also testified his wife is familiar with N.S., having known her before they were married. Although Edward may have to spend some time out of the residence in the future due to his employment, N.S. would not be left with strangers. We also note Travel's concern about N.S.' lack of attachment to both her parents. The court's comments regarding its dispositional order indicate its concern that N.S. be allowed to be with her father, whom the court found to be fit to have her custody, and that she start as soon as possible to build a relationship with him and be placed in a more stable environment than she has had in the past. In addition, respondent will not be deprived of all contact with N.S., as the court provided for visitation and ordered Edward to cooperate in that visitation.
In light of these factors, we do not find the court's order to be against the manifest weight of the evidence.
The adjudicatory and dispositional orders of the trial court are affirmed.
Affirmed.
McCULLOUGH, P.J., concurs.
COOK, J., dissents.
Justice COOK, dissenting:
I respectfully dissent and would reverse the order of the trial court adjudging N.S. an abused minor.
The modern approach to competency is to let the evidence come in for whatever it is worth, and not prevent a witness from testifying on the basis of some arbitrary test. Nevertheless, where the witness fails to possess minimum credibility, the testimony of the witness should not be considered. A witness must possess some minimum ability to observe, record, recollect and recount as well as an understanding of the duty to tell the truth. (1 J. Strong, McCormick on Evidence § 62, at 243-48 (4th ed. 1992).) The four-year-old child in this case insisted in her testimony that she had a unicorn, which she rode to the Ponderosa restaurant. She also told a caseworker, without prompting, that her father had made her say the things she said about her mother. At another visit where the same caseworker was present, the child volunteered the information that her father had abused her and told her to say that her mother had been the one who had done it. At trial, the child testified that she wanted to live with her father, and that she *1186 had told what her mother had done so that she could live with her father.
Although minor discrepancies in a child's testimony do not render the child incompetent to testify, it is clear the child in this case either is unable to separate fact from fiction, or does not understand what it means to tell the truth. To find N.S. competent on the record here is to reduce the competency requirement to a meaningless formality. In re E.S. (1986), 145 Ill.App.3d 906, 915, 99 Ill.Dec. 599, 605, 495 N.E.2d 1334, 1340 (Harrison, J., dissenting).
Steve Wilson, a Danville juvenile investigator, testified that when he spoke to N.S. on July 27, 1992, he felt that she could distinguish between truth and falsity, and he found her believable. Marty Traver, a clinical psychologist, testified that N.S. could easily distinguish between truth and falsity, her thought processes were normal and she did not tend to fantasize (apparently the child did not tell Traver about the unicorn), but nevertheless she would not be a credible witness for a criminal prosecution. The majority ignores Traver's opinion the child would not be a credible witness on the basis that this is a civil case, not a criminal case. The majority's reading of Traver's testimony is strained. Traver's testimony does not support the proposition that the child would be a credible witness in a civil case.
I question whether testimony that a witness is telling the truth, based on observation of that witness, is ever helpful to the court. I am unaware of any recognized field of expertise which qualifies an individual to be able to determine whether another person is telling the truth. (See People v. Enis (1990), 139 Ill.2d 264, 288-89, 151 Ill.Dec. 493, 502-03, 564 N.E.2d 1155, 1164-65 (eyewitness expert testimony excluded); People v. Douglas (1989), 183 Ill.App.3d 241, 255, 131 Ill. Dec. 779, 788, 538 N.E.2d 1335, 1344 (testimony regarding rape trauma syndrome not an improper comment on witness' credibility).) Polygraph tests may be of some assistance in determining whether an individual is telling the truth, but such tests are not admissible in either criminal or civil cases. (Ill. Rev.Stat.1991, ch. 38, par. 155-11; Ill.Rev. Stat.1991, ch. 110, par. 2-1104.) In In re Marriage of Dall (1989), 191 Ill.App.3d 652, 138 Ill.Dec. 879, 548 N.E.2d 109, a child was placed with DCFS while a psychiatrist attempted to determine who was telling the truth: whether the mother was guilty of sexual abuse, or whether the father had suborned perjury of the child. The psychiatrist was unable to give an answer, and the judge had to decide the case, ultimately returning the child to the mother.
The argument could be made that child sexual abuse is so devastating that in these cases, where the focus is on the best interests of the child, the safest approach is to change custody whenever an accusation is made, regardless of the quality of the proof. I reject that argument. Dispensing with proof provides incentive for false accusations, and a parent who makes such false accusations, especially one who enlists the aid of the child in doing so, is no better a custodian than is a sex abuser. (See Mullins v. Mullins (1986), 142 Ill.App.3d 57, 78, 96 Ill.Dec. 170,184, 490 N.E.2d 1375,1389 (false allegations of sexual abuse harmed children and warranted change of custody).) There is no easy answer to these cases. Although the stakes are high, the court must decide them as it does any others, on the basis of the evidence presented, even though it is possible a child may be returned to the custody of a sex abuser. See In re Marriage of Sechrest (1990), 202 Ill.App.3d 865, 876, 148 Ill.Dec. 615, 621-22, 560 N.E.2d 1212,1218-19 (custody awarded despite testimony child was abused by custodian's husband).
The majority opinion states that the child's out-of-court statements were corroborated by her in-court statements, citing Marcus, and at any rate, "those to whom N.S. had given her previous statements testified and were subject to cross-examination." (At 542 of 194 Ill.Dec. at 1184 of 627 N.E.2d). Accordingly, the majority concludes there was sufficient corroboration of the child's out-of-court statements for them to be admissible under section 2-18(4)(c) of the Act. (Ill.Rev.Stat. 1991, ch. 37, par. 802-18(4)(c).) Marcus agreed with In re Custody of Brunken (1985), 139 Ill.App.3d 232, 93 Ill.Dec. 730, 487 N.E.2d 397, that it is not sufficient corroboration that several witnesses testify the child *1187 related the claims to them. (See In re T.L. (1993), 254 Ill.App.3d 230, 234-35, 192 Ill. Dec. 775, 777-79, 625 N.E.2d 930, 932-33.) Marcus went on to say there is no requirement that a child's trial testimony be corroborated or be clear and convincing. That is certainly true, but the question is not whether the trial testimony should be admitted, but whether the out-of-court statements should be admitted. A child's out-of-court statement which rises to the level to bring it within a hearsay exception, such as a spontaneous declaration, might constitute corroboration, but the fact that the child is asked to repeat the statements to several witnesses does not. The mere fact that one of the repetitions occurred in court is no justification for admission of the child's out-of-court statements. Here the child's in-court testimony failed to possess minimum credibility and even that testimony should not have been considered.