*In re* Z.R., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Ralph Rittenhouse, Respondent-Appellant).

Fourth District   No. 4—94—0960

Opinion filed August 11, 1995.—Rehearing denied September 13, 1995.

COOK, J., dissenting.

Robert B. Webber, of Beckett & Webber, P.C., of Urbana, for appellant.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Perry Miller, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Diana Lenik, of Urbana, guardian *ad litem*.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

On March 26, 1994, the Department of Children and Family Services (DCFS) in Champaign County received a report of sexual exploitation and risk of harm involving respondent, Ralph Rittenhouse, and two relative foster children, J.K. and C.K. After interviewing respondent and his wife, Monica, co-respondent but not party to this appeal, DCFS took protective custody of respondents' natural

child, Z.R., on March 27. Following a shelter-care hearing on March 29 and 30, the trial court found probable cause to believe Z.R. was either neglected or abused and appointed DCFS as temporary custodian.

After the adjudicatory hearing on September 20, 1994, the trial court ruled count I, alleging neglect, had been proved and dismissed count II alleging abuse. At a dispositional hearing on October 27, 1994, the trial court found the neglect of Z.R. was not the result of physical abuse but was the result of neglect by respondents in providing an injurious environment. Z.R. was made a ward of the court and custody was removed from respondent. The guardianship administrator of DCFS was named guardian and Monica was named custodian. Respondent Ralph Rittenhouse argues on appeal the trial court's finding of neglect was against the manifest weight of the evidence and the decision to remove custody from him was an abuse of discretion and also against the manifest weight of the evidence. We affirm.

J.K. and C.K. were the children of Monica's sister. They were removed from their parents in September 1991 and resided in various foster homes before being placed with the Rittenhouses in May 1992 and July 1993, respectively. While not the precipitating reason for the children's removal from their parents' home, there were indicated allegations of sexual abuse by their father and other relatives in the children's past. The allegations against respondent were that he had asked his then 10-year-old niece, J.K., if she wanted to see his "private parts" and, in a completely separate incident, he exposed himself to C.K., his then eight-year-old nephew, and asked him if he wanted to "touch it or suck it." There were no witnesses to each incident besides respondent and the child involved except that Z.R., then two years old, was in the same room when the incident with J.K. occurred. Respondent denied the events occurred.

Both children testified at the adjudicatory hearing. J.K. stated the incident involving her occurred on an evening while she and Z.R. were watching television. Monica was gone from the home and respondent was in charge of watching the children. J.K. stated respondent was clothed in a T-shirt and elastic waist shorts and asked her if she wanted to, in her words, see his "private parts." She declined, respondent repeated the offer and J.K. finally left the room and went to bed, ending the incident. The next day J.K. told Monica about the incident and Monica did not believe her. Monica called respondent at work to ask him about the allegations and respondent denied them. Monica asked C.K. if he saw or heard anything and he replied no. Monica did nothing further except to discuss the incident with her mother, J.K.'s grandmother, with whom J.K. had previously lived until she made accusations about sexual abuse, later found to be

indicated, against her grandmother's husband. Monica did not leave J.K. home alone with respondent again.

Because the Rittenhouses' application for foster parent certification had not been approved, both J.K. and C.K. were scheduled to be removed from their home prior to J.K.'s reporting the incident against respondent. J.K. was removed in January 1994 and reported the incident to her new foster mother on March 26, 1994. When C.K. was interviewed by a DCFS worker the following day in his new foster home, he was asked if respondent ever had offered to show him his private parts. He replied, "Yes." He stated he was in respondent's home and Monica was out but Z.R. was home, although not in the same room where the incident occurred. J.K. had already been moved to her new foster home. C.K. stated respondent pulled his jeans down to mid-thigh and asked C.K. if he wanted to "touch it or suck it." C.K. replied he did not want to and went to bed. C.K. did not report the incident because respondent told him not to. He stated he never discussed the incident with J.K. and she never discussed her incident with him although respondent told him he had showed his private parts to J.K.

There were discrepancies between both children's trial testimony and the statements they had given the DCFS investigator, who also testified. Neither child could explain when the incidents occurred. In fact, C.K. testified his occurred in January, between Thanksgiving and Christmas, and he could not place it as winter or spring. J.K. told the investigator Monica was gone at a Boy Scout meeting but this was apparently not accurate as C.K., being the Boy Scout in the family, was not with her. J.K.'s testimony varied as far as details of where respondent was standing in the living room and where C.K. actually was as she stated at one point she was sure he could hear respondent because he was in the hallway and another time stated he was in bed. Evidence was admitted concerning psychological testing of both children and their entire DCFS history was placed before the court.

Testimony was admitted concerning C.K.'s behavior problems and his diagnosis of attention deficit disorder. There was also testimony C.K. was not always truthful. An incident was related in which he called Monica while he was in another home and told her he was home alone watching pornographic movies when he was, in fact, getting ready to eat supper with his foster family. He could not give an explanation for why he had lied to Monica.

Respondent testified and denied both incidents. He further stated he could think of nothing he had done or said that could have been misinterpreted by the children in the manner in which they had described.

The trial court stated it had a great deal of trouble coming to a decision. The Rittenhouse family appeared to be nice and likable and it was difficult for the trial court to imagine, much less believe, the allegations against respondent. Nothing in respondent's testimony appeared to be untruthful. The trial court indicated if it had been evaluating the testimony of J.K. and respondent alone, the court did not believe the State would have met its burden of proof.

The trial court found C.K. to be much more credible, with a much better memory than his sister and his testimony as to detail was very specific. The court stated C.K. fixed the time as somewhere between Thanksgiving and Christmas and it was impressed by the fact C.K. and J.K. had not spoken to each other about the events but had arrived at their remarkably similar stories independently. The trial court stated it had taken into consideration the children's backgrounds of abuse, which gave them knowledge of sexual matters beyond their years, as well as the troubling aspects of each child's personality. While the court acknowledged J.K. admitted to some bias by stating she wanted to see Z.R. removed from the Rittenhouses' custody, the other motives argued by attorneys for respondents were purely conjecture and not supported by evidence. C.K. had no motive to testify falsely as he wanted to stay with the Rittenhouses.

The trial court concluded by stating counsel for respondent had made a valid point by noting there was no way for someone in respondent's position to defend himself against allegations such as these except to come into court and deny them. The trial court stated it found this point frightening and especially so in this case as it could not find anything in respondent's testimony which was inherently incredible or unbelievable. However, the trial court concluded it was at a loss to explain how the two children independently arrived at their versions of two distinct, but in certain ways similar, events and had no reason to either lie or imagine them. Therefore, it concluded the allegations as to neglect of Z.R. because of injurious environment were proved by a preponderance of the evidence.

As respondent notes, the trial court appears to have erred in stating C.K. could pinpoint the incident involving him to a time between Thanksgiving and Christmas when his testimony also included the statement J.K. was already in her new foster home (she moved in January), the incident occurred in January and he could not be sure if it occurred in winter or spring. Also noted are discrepancies in the testimony of the 8- and 10-year-old witnesses; problems in their backgrounds; respondent's own credible testimony; and the trial court's recognition of the difficult position respondent was placed in to defend himself. However, despite noting these elements of the

case, we cannot say the trial court's finding of neglect was against the manifest weight of the evidence.

■ A determination of neglect is within the discretion of the trial court and will not be disturbed unless it is against the manifest weight of the evidence. (*In re Stilley* (1977), 66 Ill. 2d 515, 520, 363 N.E.2d 820, 822; *In re B.K.* (1984), 121 Ill. App. 3d 662, 665, 460 N.E.2d 43, 46.) A finding of the trial court is found to be against the manifest weight of the evidence only if a review of the record "clearly demonstrates" the opposite result was the proper one. (*In re T.B.* (1991), 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893, 896.) We will not overturn the trial court's findings merely because we might have reached a different conclusion. We will not second-guess the trial court on the issue of credibility. The trial court is in the best position to determine the credibility of witnesses. *In re S.M.* (1988), 171 Ill. App. 3d 361, 365, 525 N.E.2d 565, 568.

The trial court recognized C.K. had lied about being unsupervised and watching X-rated movies. However, the trial court questioned C.K. and was convinced C.K. understood the significance of his testimony in court and the difference between truths and lies.

■ A trial court's finding of abuse has been upheld on appeal despite internal inconsistencies in the testimony of child witnesses and no corroborating evidence when a trial court simply found the children to be credible witnesses. (See *In re T.H.* (1986), 148 Ill. App. 3d 877, 882-83, 499 N.E.2d 988, 991-92.) In this case each child's testimony does not directly corroborate the other's by verifying details of each other's statement, but indirectly they do corroborate each other because they have independently testified to two distinct but relatively similar events without any evidence of collusion. This fact was of great importance to the trial court in determining whether the incidents actually occurred. The trial court's finding respondent committed the acts alleged by J.K. and C.K. was not against the manifest weight of the evidence.

■ Turning next to the concept of neglect based upon an injurious environment, the concept is an amorphous one (*In re Harpman* (1986), 146 Ill. App. 3d 504, 511, 496 N.E.2d 1242, 1246) and each case involving such an allegation should be considered under the specific circumstances of that case. (*In re B.M.* (1993), 248 Ill. App. 3d 76, 79, 618 N.E.2d 374, 376.) A finding of abuse of one sibling establishes a *prima facie* case of neglect based upon an injurious environment to another. *In re David D.* (1990), 202 Ill. App. 3d 1090, 1092-93, 560 N.E.2d 966, 968; *In re Brooks* (1978), 63 Ill. App. 3d 328, 339, 379 N.E.2d 872, 880-81.

■ Although respondent was found to have made inappropriate

sexual comments to J.K. and exposed himself to C.K., he argues there is no indication in the record Z.R. was even aware of the conduct, let alone affected by it. Neglect due to injurious environment has been found where the child did not know about nor was he exposed to sexual abuse of a sibling (see *David D.*, 202 Ill. App. 3d at 1092, 560 N.E.2d at 967) and where the father was previously adjudged unfit because of sexual abuse of daughters by a prior marriage but had failed to address the problem even though there was no evidence of sexual abuse of the children of the present marriage (see *Harpman*, 146 Ill. App. 3d at 514, 496 N.E.2d at 1248).

The trial court noted Monica did not believe J.K. when she told her about respondent's comments to her, so Monica could not be counted on to protect Z.R. from respondent. Therefore, in addition to the allegations against respondent, which the court determined were proved by a preponderance of the evidence, there was no protection offered Z.R. in his home environment. The court's determination Z.R. was a neglected minor based upon an injurious environment was not against the manifest weight of the evidence.

■ Respondent also contends the trial court's order removing custody of Z.R. from him was against the manifest weight of the evidence and was an abuse of discretion. Custody rights must be determined on a case-by-case basis and the standard to be applied is the best interest of the child. (*Stilley*, 66 Ill. 2d at 520-21, 363 N.E.2d at 822; *In re J.K.F.* (1988), 174 Ill. App. 3d 732, 733-34, 529 N.E.2d 92, 93.) A trial court's determination as to custody will not be disturbed unless it is against the manifest weight of the evidence. *Stilley*, 66 Ill. 2d at 520, 363 N.E.2d at 822.

In support of his position he has done everything requested of him by DCFS and proved himself to be a loving and caring parent concerned for the welfare of his children, respondent cites his love and concern for his children, both Z.R. and the new child born during the pendency of these proceedings, B.R.; participation in parenting classes with glowing reports; participation in psychological evaluations, counseling and other screenings requested by DCFS; and attendance at all visitations. Respondent also notes while custody of Z.R. was returned to Monica and he is no longer deprived of his mother during the traumatic time following the birth of a new sibling, both the new baby and Z.R. are deprived of the full-time nurturing of their father and this was not in the best interest of Z.R.

The trial court took into account its concern about Z.R.'s separation from his parents following the birth of his brother and the fact respondent had completed almost all requirements set forth by DCFS to address the problems encountered and had received glowing

reports as well as the fact there was an agreed-upon protective plan in place for B.R. so he could remain with Monica and the court felt the plan would work for Z.R. too. However, the court also noted respondent was found to have committed certain inappropriate sexual acts against children in his care and his wife would not protect Z.R. if the need arose. The one thing lacking was respondent's refusal to admit *or address* the inappropriate sexual acts and seek counseling on this issue. The record is not clear respondent refused to seek counseling on this subject although he does refuse to admit the actions.

Respondent contends the State belabors the point he has not admitted to any incidents of sexual abuse and further contends the State will not be satisfied without such an admission or else it will seek termination of his parental rights. The trial court, noting this difficulty also, said it would wait for further evaluations and, hopefully, testimony from experts which would guide it in future decisions concerning the reunification of the Rittenhouse family because it did not seek false or half-hearted admissions of guilt from parents who would do anything to get their children back as that would not help anyone.

The dispositional order in this case was one of custody only. We are not dealing with a termination of parental rights. Given the evidence as it existed at the time of the dispositional hearing, we find the trial court's order finding it in the best interest of Z.R. to remove him from the custody of respondent was not against the manifest weight of the evidence.

Affirmed.

STEIGMANN, J., concurs.

JUSTICE COOK, dissenting:
I respectfully dissent and would reverse.

J.K. is a 10-year-old female. C.K. is her eight-year-old brother. In 1991, the two were removed from their parents amidst allegations of sexual abuse against their father, Leonhard. J.K was placed in the custody of her grandparents, but that came to an end after J.K. made allegations of abuse against her grandfather. In May 1992, C.K. was placed with Ralph and Monica Rittenhouse, and in July 1993, J.K. was placed with them as well. Monica is the sister of the children's mother. On the occasion in question, Monica visited a friend, and J.K. was upset because she could not go along. The next morning J.K. related to Monica that Ralph asked her if she wanted to see his "private parts." Monica did not leave J.K. home with Ralph again.

Because the Rittenhouses' application for foster parent certification had not been approved, the children were placed in new foster homes in January 1994. From his new foster home, C.K. called Monica and told her that he was home alone, watching X-rated movies. A police officer came to the home to investigate, and C.K. later admitted that he had lied. On March 26, 1994, while J.K. was talking to her foster mother, Karen Moore, about her father, Leonhard, she stated that the described incident had occurred with Ralph. DCFS investigator David Harmon spoke to C.K. on March 27 in a separate foster home. He asked C.K. if C.K. had ever felt uncomfortable when he was living at the Rittenhouses. C.K. said "no." Harmon then asked C.K. if Ralph had ever offered to show him his private parts, and C.K. replied "yes." That questioning seems inartful and suggestive.

Harmon was concerned about the Rittenhouses' two-year-old son, Z.R., who was living in their home. He asked Ralph to move out of the home. Ralph agreed and continues to live outside the home. Nevertheless, Z.R. was placed in a foster home for a period of time, although he is now in Monica's custody. The Rittenhouses have another son, B.R., born August 22, 1994. DCFS is concerned about the well-being of B.R. and has reached some sort of agreed protection plan so that he may remain with Monica.

The trial court concluded Ralph's testimony was credible and that there were credibility and bias problems with J.K.'s testimony. However, the trial court felt that when the testimony of the two children was taken together there was enough evidence to conclude that Z.R. was neglected. Once it passed that hurdle, the trial court faulted Monica for not believing J.K. when J.K. told her about the incident, and concluded that Monica could not be counted on to protect Z.R. from Ralph. I do not understand how the trial court can be critical of Monica for not believing J.K., or of Ralph for not admitting the abuse, when the trial court itself did not believe J.K. By J.K.'s testimony she has been abused by every adult male in whose home she has resided. C.K.'s testimony is much the same. Unless we are to conclude that all men are sex abusers, we should view this testimony with suspicion, as Monica did. We should recognize that children, even children who are victims of sexual abuse, are themselves capable of manipulation and use of the system in order to achieve their own ends. Any foster parents who take in J.K. or C.K. are at considerable risk.

As far as J.K. or C.K. is concerned, perhaps the safest approach is for them to be removed from the Rittenhouse home. The risks attendant to a false negative may be greater than the burdens atten-

dant to a false positive. With Z.R. and B.R., it is another matter. As a result of the flimsy evidence in this case, the trial court has broken up a marriage, and a two-year-old child has been taken from both his parents for some period of time, and from his father perhaps forever. True, the course taken avoids the possibility that Z.R. or B.R. might sometime be abused by Ralph, in the event that the allegations against Ralph are true. That course of action, however, is not without its costs, which I see as overwhelmingly outweighing any benefits. There is no easy answer to these cases. Although the stakes are high, the court must decide them as it does any others, on the basis of the evidence presented, even though it is possible a child may be returned to the custody of a sex abuser. (See *In re N.S.* (1994), 255 Ill. App. 3d 768, 780, 627 N.E.2d 1178, 1186 (Cook, J., dissenting).) Surely the time has passed when we assume that children do not lie about sexual abuse. See Levy, *Using "Scientific" Testimony to Prove Child Sexual Abuse*, 23 Fam. L. Q. 383, 391-92 (1989-90).

The trial court indicated it would wait for further evaluations and, hopefully, testimony from experts which will guide it in its future decisions. Even though this case is a difficult one, it is the trial court which must decide it, and reliance on experts is likely to be futile. See, *e.g., In re Marriage of Dall* (1989), 191 Ill. App. 3d 652, 548 N.E.2d 109 (child placed with DCFS while psychiatrist made unsuccessful attempt to determine who was telling truth).

The State quotes in its brief the report of Dr. Marty Traver, a psychologist:

> "What is clear about this couple, however, is that there are factors present which are common in families where there is sexual abuse of the type alleged: a poor and stressed marital relationship, a man of limited intellectual functioning, inappropriate affect, a spouse who refuses to even consider whether or not abuse occurred, and a dominant female with a passive male."

Dr. Traver stated this was not an implication that Ralph committed the sexual abuse, but I see no other purpose for which it was admitted. Testimony of the characteristics of child abuse perpetrators is improper evidence of past conduct to show the propensity of a defendant to commit crime. (*People v. Bradley* (1988), 172 Ill. App. 3d 545, 551-52, 526 N.E.2d 916, 921; *People v. King* (1993), 248 Ill. App. 3d 253, 274-75, 618 N.E.2d 709, 723-24.) *Bradley* and *King* were criminal cases but I see no reason for any different rule here. It is a mistake to use this sort of theorizing as a substitute for evidence.

The majority opinion seems to suggest there is no big problem here, because this order was only a custody order, and not an order terminating parental rights. Under our law, however, a finding of ne-

glect by a preponderance of the evidence can become a finding of unfitness by clear and convincing evidence with the passage of time. (750 ILCS 50/1(D)(m) (West 1992) (failure to make reasonable efforts to correct conditions or to make reasonable progress toward return within 12 months after an adjudication of neglect).) If Ralph is not suitable to have custody now, what can he do to correct conditions or make progress in the next 12 months?

In my view, the trial court's determination that Z.R. has been neglected by his parents is contrary to the manifest weight of the evidence. The decision that it was in the best interests of Z.R. for his father to move out of the marital home and be raised by his mother alone is also contrary to the manifest weight of the evidence. I would reverse the decision of the trial court.