NO. 4-98-0038

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In the Interest of M.D.H., a Minor, )   Circuit Court of

THE PEOPLE OF THE STATE OF ILLINOIS, )   Pike County

Petitioner-Appellee, )   No. 97JA6

v. )

JOHNNY RAY HOWELL, )    

Respondent-Appellant, )   

and )   Honorable

CHERYL BAXTER, )   Michael R. Roseberry,

Respondent. )   Judge Presiding.

_________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In September 1997, the State filed an amended petition for adjudi­ca­tion of wardship, alleging that M.D.H. (born November 13, 1981), the minor child of respon­dent father, Johnny Howell, and respon­dent mother, Cheryl Baxter, was ne­glect­ed and abused.  In November 1997, the trial court con­duct­ed a hearing and found that M.D.H. was a neglected and abused minor, pursu­ant to sec­tions 2-3(1)(b) and 2-3(2)(iii) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b),(2)(iii) (West 1996)).  After a December 1997 dispositional hearing, the court formal­ly adjudi­cated M.D.H. a ward of the court and appoint­ed the Department of Children and Family Servic­es (DCFS) as her guardian with the power to place her.  

Respon­dent father ap­peals, arguing that (1) the trial court erred by allowing M.R.H., M.D.H.'s 13-year-old broth­er, to testify outside of respondent father's presence; (2) the court erred by refusing to strike a certain witness' testimony; and (3) the court's find­ings of neglect and abuse were against the manifest weight of the evi­dence.  We affirm.

I. BACKGROUND

Because the parties are familiar with the evi­dence, we discuss it only to the extent neces­sary to put respon­dent father's arguments in context.  In its September 1997 amended petition, the State alleged that (1) respon­dent father had neglected M.D.H. because he created an envi­ron­ment injuri­ous to her welfare in that he put her at risk of sexual harm by sexual­ly abusing S.H., M.D.H.'s minor brother, and L.G., M.D.H.'s minor stepsister (count I) (705 ILCS 405/2-3(1)(b) (West 1996)); and (2) respon­dent father had abused M.D.H. because he committed a sex offense against M.D.H. by having sexual intercourse with her (count II) (705 ILCS 405/2-3(2)(iii)).

At the November 1997 adjudi­ca­tory hearing, the evi­dence showed the follow­ing.  Sheila Catron, a social service worker in Lewis County, Missouri, testified that in May 1997, she inter­viewed S.H. (born June 15, 1991) pursu­ant to a report that he had attempted to kiss his female cousin's "crotch area" during an after-school pro­gram.  During the interview, S.H. told her that respondent father had taught him how to kiss respon­dent father's private area.  S.H. told Catron that respondent fa­ther asked him "to get under his father to kiss his private area."  S.H. also cor­rect­ly identi­fied the genital area using a stuffed animal.  Catron stated that, based upon S.H.'s responses, these inci­dents took place when S.H. was between three and six years of age. 

David Parrish, a juve­nile officer in Lewis County, testi­fied substan­tially the same as Catron regard­ing what S.H. said during the May 1997 interview.  

On cross-examina­tion, Catron testi­fied that S.H.'s mother had told her that "with [S.H.'s] age and stuff[,] he did like to tell stories."  S.H.'s counselor also indicated that he had "a very large imagination."  

S.H. testified that he used to live with respondent father, but he moved out because respondent father tried "to do the sex" with S.H. when S.H. visited him.  S.H. stated that respondent father was "going to try to touch [S.H.'s] private and [S.H.] didn't want him to do it."  Respondent father also wanted S.H. to touch respondent father's "private," but S.H. never did.  S.H. also stated that the incident happened in June, "a long time ago."  S.H. further stated that M.D.H. was there and tried to stop respondent father.

On cross-examination, S.H. testified that the incident hap­pened when he was two years old.  S.H. stated that he did not know the present year or month.  Upon questioning by the trial court, S.H. testified that he knew the difference between the truth and a lie.

Dr. Shari Marshall, the superintendent of schools for the Barry, Illinois, school system (where M.D.H. was a junior high school student during 1996), testi­fied that in March 1996, M.D.H. came to her office and asked to speak with Marshall.  M.D.H. was "very upset and crying."  During that conversation, M.D.H. told Mar­shall that "[s]he felt that she was being required to do many, many, many chores, her homework, take care of her little broth­er[,] *** [and] [s]he just felt like she was just being required to be a wife."  Marshall stated that because of an earlier conversation, she asked M.D.H. if by being a wife M.D.H. meant that she also slept with respondent father.  M.D.H. re­sponded "sometimes."  Marshall also stated that because of the earlier conversation, she thought M.D.H. meant that she slept with respondent father "in a sexual manner."  Marshall acknowl­edged that M.D.H. recanted within a week of their conversation and that M.D.H. "told DCFS that that's not what she meant."  

On cross-examination, Marshall testified that she instructed the school principal to report to DCFS the possible sexual relation­ship between M.D.H. and respondent father.  Marshall stated that in May 1996, DCFS sent the principal a letter indi­cating that it had inves­tigat­ed the report and deter­mined that it was "unfound­ed."

On redirect examination, Marshall testified that when she asked M.D.H. what she meant by having to do "everything else a wife has to do," M.D.H. began crying harder and responded, "you know, everything."    

M.R.H., M.D.H.'s brother and respondent father's biological child, testi­fied that during the summer of 1995, he lived with respon­dent father and M.D.H. for a period of two to three months.  M.R.H. stated that, one evening during that period, he came home and noticed that the television was on at a loud volume.  He turned the television off and then looked in respon­dent father's room because he thought he heard M.D.H. say "help."  He saw respondent father on top of M.D.H., "moving up and down."  Respondent father and M.D.H. were covered up to their backs, and neither was wearing any clothing that M.R.H. could see.

On cross-examination, M.R.H. testified that he did not tell anyone about the incident because he did not think it was anyone's business.  M.R.H. also stated that he observed respon­dent father and M.D.H. for about one minute.  M.R.H. further stated that he takes Prozac, Ritalin, and a blood pres­sure medication, and he attends classes for students with behavior disorders.  He also acknowledged that he did not like respondent father, and he moved out of respondent father's home, in part, because respondent father had broken a "2 by 4" and a pool cue over his back.       

M.D.H. testified that respondent father had not acted in a sexually inappropriate manner with her, and she had never told anyone otherwise.  She stated that she talked with Marshall because she was upset about having to do chores.  She also stated that she forgot to tell Marshall that when she slept in respon­dent father's bed, he slept on the couch.  

On cross-examination, M.D.H. testified that Marshall did not ask her what she meant by the phrase "everything that a wife has to do."  She denied telling Marshall that "everything" meant "you know, everything."  She stated that following their conversation, she tried to explain to Marshall what she had meant, but Marshall was too busy.  

Based on this evi­dence, the trial court adjudi­cated M.D.H. a ne­glected minor based upon respondent father's sexual abuse of S.H., as alleged in count I, and an abused minor as alleged in count II.  The court found that the State failed to prove that respondent father had sexually abused L.G. as alleged in count I.

II. ANALYSIS

A.  M.R.H.'s Testimony Outside of Respondent Father's Presence

Respondent father first argues that the trial court erred by allowing M.R.H. to testify outside respondent father's presence.  We disagree.

Section 2-18(4)(d) of the Act provides as follows:

"There shall be a rebuttable presumption that a minor is competent to testify in abuse or neglect proceedings.  The court *** may allow the minor to testify in chambers with only the court, the court reporter[,] and attorneys for the parties present."  705 ILCS 405/2-18(4)(d) (West 1996).

Section 1-3(10) of the Act defines "minor" as "a person under the age of 21 years subject to this Act."  705 ILCS 405/1-3(10) (West 1996).

Respondent father objected to M.R.H.'s testifying outside of respondent father's presence on the ground that section 2-18(4)(d) of the Act does not permit a nonparty minor who was not named in the petition to testify outside of a respondent's presence.  The court overruled respon­dent father's objection and stated the following:

"The [c]ourt does have wide discretion.  The statute is clear that the minor that is the subject of abuse can testify outside of the presence of the parents or the respon­dents.  The theory I assume is that it would put pressure on a minor to be required to testify in front of their parent or parents of acts that were committed by their parent or parents against them or other children.  The pressure would still exist in the case of an observer, in other words, pressure to testify to an incident in front of their parent or parents, so I will allow this wit­ness to testify."

We agree with the trial court that--under the circum­stances of this case--M.R.H., a then 13-year-old child, would have experi­enced a similar fear of and pressure about testifying in the presence of respon­dent father as would a child who was the subject of the abuse petition.  M.R.H. testi­fied that he watched his father commit a morally reprehensi­ble act upon M.D.H.  Specifi­cally, M.R.H. saw his father and M.D.H. in bed togeth­er without any clothes on their upper bodies, and his father was on top of M.D.H., "moving up and down."  Moreover, M.R.H.'s testimo­ny that his father had previ­ous­ly hurt him by breaking a "2 by 4" and a pool cue over his back provides further support for M.R.H.'s fear of testi­fy­ing in respon­dent father's presence.  

The over­rid­ing purpose of the Act is "to ensure that the best inter­ests of the minor, the minor's family, and the communi­ty are served."  
In re J.J.
, 142 Ill. 2d 1, 8, 566 N.E.2d 1345, 1349 (1991).  At each step of the adjudi­cation process, the trial court has a duty to further that purpose.  
In re A.F.
, 234 Ill. App. 3d 1010, 1014, 602 N.E.2d 480, 483 (1991).  In addi­tion, the trial court shall administer the Act "in a spirit of humane concern, not only for the rights of the parties, but also for the fears and the limits of understanding of all who appear before the court."  705 ILCS 405/1-2(2) (West 1996).  Further­more, a pro­ceed­ing under the Act consti­tutes a civil pro­ceed­ing--meaning that no sixth amendment right to confront witnesses is implicated (U.S. Const., amend. VI)--and is nonadversarial in nature.  
J.J.
, 142 Ill. 2d at 8, 566 N.E.2d at 1348-49; 
In re Brooks
, 63 Ill. App. 3d 328, 340, 379 N.E.2d 872, 881 (1978).  

Section 2-18(4)(d) of the Act does not expressly autho­rize a nonparty minor to testify outside the respondent's pres­ence.  Nonetheless, considering (1) the overrid­ing purpose of the Act, (2) that the trial court has a 
duty
 to ensure that the best inter­ests of not only the minor but the minor's family are served at every stage of the proceed­ings under the Act, and (3) that the court must administer the Act "in a spirit of humane concern" for "all who appear before the court," we con­clude that, under the partic­u­lar circum­stanc­es present in this case, the court did not err by allow­ing M.R.H., a minor child of respondent father, to testify outside of respon­dent father's pres­ence.

We find support for this conclusion in 
Brooks
, in which the appellate court--prior to the enactment of section 2-18(4)(d) of the Act in Public Act 85-601 (Pub. Act 85-601, eff. January 1, 1988 (1987 Ill. Laws 2578, 2683))--upheld a trial court's deci­sion to allow a minor to testify outside the respondents' pres­ence, but with counsel for all parties present.  In upholding the trial court's deci­sion, the 
Brooks
 court wrote the following:

"[A] child-neglect case is a nonadversary proceeding and the primary con­cern is the best interests and welfare of the child.  [Citation.]  As in custody cases, the trial court must have discretion to interview the child in the privacy of chambers.  Gener­ally, there is an inherent fear in the child to testify, which may be an obstacle to as­cer­taining the truth."  
Brooks
, 63 Ill. App. 3d at 340, 379 N.E.2d at 881-82.   

B.  The Trial Court's Refusal To Strike Marshall's Testimony

Respondent father next argues that the trial court erred by refusing to strike Marshall's testimony because DCFS investigated Marshall's report of possible sexual relations between respondent father and M.D.H. and determined that the report was "un­found­ed."  Specif­i­cal­ly, he con­tends that either (1) DCFS' "unfounded" report should have been admitted into evi­dence; or (2) the court should have strick­en Marshall's testi­mo­ny.  We dis­agree.

Initially, we note Marshall testified that in May 1996, the principal of M.D.H.'s school received a letter from DCFS indi­cat­ing that it had deter­mined that the report of possible sexual rela­tions between respondent father and M.D.H. (based upon Marshall's March 1996 conversation with M.D.H.) was un­founded.  Thus, the trial court had before it--and could consid­er--the fact that DCFS had deter­mined that the report was unfounded.  Indeed, the court specifically indicat­ed--in response to a ques­tion by respon­dent father's counsel--that it had heard the evidence that DCFS had determined that the report was un­founded.  The court also noted that none of the parties even requested that the un­found­ed report be admitted into evidence.   

Respondent father also asserts that the trial court should have stricken Marshall's testimony because it "was not corrobo­rated by a 'founded' report, and thus admissible by [section 2-18(4)(a) of the Act] (705 ILCS 405/2-18(4)(a)[) (West 1996)]."  The problem with this asser­tion--as the State correctly points out--is that Marshall's testimony was admissible pursuant to section 2-18(4)(c) of the Act, 
not
 section 2-18(4)(a) (which provides for the admission of "[a]ny writing, record, photo­graph[,] or x-ray of any hospital or public or private agency") (705 ILCS 405/2-18(4)(a) (West 1996)).  Section 2-18(4)(c) provides that "[p]revious statements made by the minor relating to any allega­tions of abuse or neglect 
shall
 
be
 admissi­ble in evidence."  (Emphasis added.)  705 ILCS 405/2-18(4)(c) (West 1996); 
In re N.S.
, 255 Ill. App. 3d 768, 776, 627 N.E.2d 1178, 1184 (1994).  Thus, we hold that the court did not err by refus­ing to strike Marshall's testimony regarding M.D.H.'s statements to her.       

C. Adjudication of Neglect

Respondent father next argues that the trial court's find­ing of neglect was against the mani­fest weight of the evi­dence.  We dis­agree. 

Initially, we address respondent father's contention that, to prove that M.D.H. was neglected due to an injurious environ­ment, the State was re­quired to prove that respon­dent father commit­ted the offense of crimi­nal sexual abuse against S.H., as defined in the Crimi­nal Code of 1961 (Code) (720 ILCS 5/12-15(a)(2) (West 1996)).  He thus claims that the State failed to sustain its burden of proof because the trial court found only that respon­dent father at­tempted to touch S.H.'s sex organs and asked S.H. to touch respondent father's sex organs.  We dis­agree.

In count I of its amended petition, the State alleged, in relevant part, that respon­dent father had neglected M.D.H. because he created an envi­ron­ment injuri­ous to her welfare in that he put her at risk of sexual harm by sexually abusing S.H., M.D.H.'s minor brother (705 ILCS 405/2-3(1)(b) (West 1996)).  In adjudicating M.D.H. neglected based upon an injurious environment as alleged in count I, the trial court found that respon­dent father "did at least attempt to touch [S.H.'s] private parts and asked [S.H.] to touch his private parts," and sufficient evidence existed "that the environment in the home of [respondent father] is injurious to the welfare of the minor child [M.D.H.] based on his sexual abuse of S.H."  

Proof that one minor is ne­glect­ed, abused, or depen­dent is admissible evidence on the issue of neglect, abuse, or depen­dency of any other minor for whom the parent is responsi­ble.  In addition, a parent's behavior toward one minor may be consid­ered when decid­ing whether a sibling is exposed to an injurious environ­ment.  
In re K.G.
, 288 Ill. App. 3d 728, 736, 682 N.E.2d 95, 100 (1997). 

In 
In re Z.R.
, 274 Ill. App. 3d 422, 654 N.E.2d 255 (1995), the State alleged that the minor, Z.R., was ne­glected based upon an injuri­ous environ­ment in that respon­dent uncle made inappro­priate sexual comments to his 10-year-old niece (J.K.) and exposed himself to his 8-year-old nephew (C.K.).  In uphold­ing the trial court's determination that Z.R. was neglected based upon an injurious environment, this court wrote the follow­ing:

"A finding of 
abuse
 of one sibling es­tablish­es a 
prima
 
facie
 case of neglect based upon an injurious environment to another.  [Cita­tions.]

Al­though re­spon­dent was found to have made inappropriate sexual comments to J.K. and exposed himself to C.K., he argues there is no indication in the record Z.R. was even aware of the conduct, let alone affected by it.  Neglect due to injurious environment has been found where the child did not know about nor was he exposed to 
sexual
 
abuse
 of a sib­ling [citation] and where the father was previously adjudged unfit because of sexual abuse of daughters by a prior marriage but had failed to address the problem even though there was no evidence of sexual abuse of the children of the present marriage [citation]."  (Emphasis added.)  
Z.R.
, 274 Ill. App. 3d at 427-28, 654 N.E.2d at 259.     

In 
Z.R.
, this court concluded--implicitly, at least--that a respondent's inappropriate sexual comments and exposure of himself to another child constitute "sexual abuse," and a finding of such abuse es­tablish­es a 
prima
 
facie
 case of neglect based upon an injurious environ­ment.   
Z.R.
, 274 Ill. App. 3d at 427-28, 654 N.E.2d at 259.       

Consistent with 
Z.R.
, we conclude that when the State alleg­es--as in this case--that a minor is ne­glect­ed due to an injuri­ous environ­ment based upon the respon­dent's "sexual abuse" of a sibling, "sexual abuse" may have a broader meaning than "criminal sexual abuse" as it is defined in section 12-15(a)(2) of the Code (720 ILCS 5/12-15(a)(2) (West 1996)).  

In so concluding, we note that were we to accept respon­dent father's contention, the trial court here could not have found M.D.H. to be a neglected minor based upon an injurious environ­ment as a result of respondent father's attempting to touch S.H.'s sex organs or his requests that S.H. touch respon­dent father's sex organs.  Clearly, such conduct on respondent father's part falls within the concept of statuto­ry neglect based upon an injuri­ous envi­ron­ment.  See 
In re B.M.
, 248 Ill. App. 3d 76, 79, 618 N.E.2d 374, 376 (1993) (the concept of "inju­ri­ous envi­ron­ment" is amor­phous and cannot be defined with particu­lari­ty; there­fore, each case must be reviewed based upon its specific facts).  Thus, the court could consider respondent father's sexual­ abuse of S.H. (by attempting to touch S.H.'s sex organs and re­questing that S.H. touch respondent father's sex organs) in determining whether M.D.H. was a ne­glect­ed minor based upon an injuri­ous envi­ron­ment.  See 
K.G.
, 288 Ill. App. 3d at 736, 682 N.E.2d at 100; see also 
Z.R.
, 274 Ill. App. 3d at 427-28, 654 N.E.2d at 259.  More­over, we note that accepting respondent father's contention would be con­trary to the over­rid­ing purpose of the Act--namely, "to ensure that the best inter­ests of the minor, the minor's family, and the communi­ty are served."  
J.J.
, 142 Ill. 2d at 8, 566 N.E.2d at 1349.           

In a proceeding under the Act for adjudication of abused, ne­glected, or dependent minors, the State must prove its allega­tions by a preponderance of the evidence.  
N.S.
, 255 Ill. App. 3d at 776, 627 N.E.2d at 1184.  We will not disturb a trial court's find­ings that a child was abused or neglected unless they are against the mani­fest weight of the evi­dence.  
In re B.W.
, 216 Ill. App. 3d 410, 414, 576 N.E.2d 346, 349 (1991).  Further, this court in 
Z.R.
, 274 Ill. App. 3d at 427, 654 N.E.2d at 258-59, wrote the follow­ing:

"A finding of the trial court is *** against the mani­fest weight of the evi­dence only if a review of the record 'clearly demonstrates' the opposite result was the proper one.  [Citation.]  We will not over­turn the trial court's findings merely be­cause we might have reached a different con­clusion.  We will not second-guess the trial court on the issue of credibility.  The trial court is in the best position to determine the credibility of witnesses."

In 
Z.R.
, this court upheld on appeal the trial court's finding of neglect despite discrepancies between the prior statements and trial testimony of the child witnesses.  
Z.R.
, 274 Ill. App. 3d at 427, 654 N.E.2d at 259.  

In finding that M.D.H. was neglected, the trial court stated, in relevant part, the following:

"We have the testimony of Miss Catron who investigated an incident involving [S.H.] that was called in through the hotline where [S.H.] indicated in response to being ques­tioned about some improper touching at the [after-school program]; that during visita­tion with [re­spon­dent] father[,] his father taught him to do it and some other language about pri­vates of his father's and his.  Seemed to be a rather frank response from a child who was fairly young at the time, one that I don't believe was an effort to pin something on his father to get himself out of trouble.

* * *

[We also have t]he evidence of David Parrish, that he likewise interviewed [S.H.] and his an­swers were consistent with that of Miss Catron's. 

* * *

We have the testimony of [S.H.], [a  six-]year[-]old minor who really I thought did a fairly good job testifying.  He cer­tainly has a problem with dates.  I do find him to be a person who knew the difference between tell­ing the truth and telling a lie.  I do find that his testimony was credible, that his father did at least attempt to touch his private parts and asked him to touch his private parts.

* * *

***  I believe there was an argument about the word sexual abuse being defined in the statute, not being within the--not being with the exact evidence that has been submit­ted here today.  In this [c]ourt's opinion[,] there is sufficient evidence be­fore this [c]ourt that shows that the environment in the home of [respondent father] is injurious to the welfare of the minor child [M.D.H.] based on his sexual abuse of S.H." 

Reviewing the record before us in accordance with the proper standard of review, we cannot conclude that it "'clearly demonstrates' the opposite result was the proper one."  
Z.R.
, 274 Ill. App. 3d at 427, 654 N.E.2d at 259, quoting 
In re T.B.
, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893, 896 (1991).  Accord­ing­ly, we hold that the trial court's adjudi­ca­tion of M.D.H. as a ne­glected minor was not con­trary to the manifest weight of the evidence. 

D.  Adjudication of Abuse

Last, respondent father argues that the trial court's find­ing of abuse was against the mani­fest weight of the evi­dence.  We dis­agree.

As earlier stated, we will not disturb a trial court's find­ings that a child was abused or neglected unless they are against the mani­fest weight of the evi­dence.  
B.W.
, 216 Ill. App. 3d at 414, 576 N.E.2d at 349.    

In finding that M.D.H. was abused, the trial court stated, in relevant part, the following:

"The [c]ourt has considered the evidence adduced in these proceedings and the argu­ments of counsel.  

* * *

[We have the t]estimony of Dr. Marshall.  Now, the fact that Dr. Marshall did not ap­pear at the first hearing in my opinion adds to her cred­ibili­ty.  Dr. Marshall at the outset had a discus­sion with the minor who is the prima­ry sub­ject of this petition.  ***  Dr. Mar­shall is an educator and a very sensi­bly educated person.  She understands things that are said to her that may not be said in spe­cific lan­guage.  The discussion between Dr. Marshall and the minor[,] in this [c]ourt's opinion[,] clearly was an admission by the minor that she was having sexual rela­tions with [respon­dent] father, and I specif­ically find Dr. Marshall's testimony in that aspect to be credible.

We then have today testimony of [M.R.H.] ***.  ***  [M.R.H.] has certain problems in and of himself that are being addressed through medication.  I didn't find the ef­fects of his medication in any way [detract­ed] from his credibility.  He tes­ti­fied to ob­serving an incident.  Was­n't exact­ly sure when it occurred but it was well over a year ago.  He *** was pretty specific as to what he saw.  He was really consistent in his answers except for a few[,] which does not totally -- which is not unex­pected.  I think and I do find that [M.R.H.'s] testimony was credible, that he saw what he said he saw.

* * *

Then we have the testimony of [M.D.H.], and I can certainly understand the dilemma that [M.D.H.] is facing and faced today.  A person who she has lived with for the entire­ty of her life and who has been her primary caretaker for all but 6 months or a little bit more than that of her life is[,] in this [c]ourt's opinion[,] a person who she has had a sexual relationship with; and to come to [c]ourt and have to acknowledge that, indi­cate that that occurred, would be a very difficult situation.  So the reasons for her testimony not being credible are fairly evi­dent, and I do not find her testimony to be credible.

* * *

Count 2 said minor is an abused minor as defined under [section 2-3(iii) of the Act] [(]705 ILCS 405/2-3(iii) (West 1996)[)] in that the minor's father has committed a sex offense against the minor by having sexual intercourse with her.  Certainly what [M.R.H.] observed gave the appearances of sexual intercourse.  The minor[,] in this [c]ourt's opinion[,] did admit to Dr. Mar­shall, although not using those words, but sexual intercourse had taken place.  There­fore, the [c]ourt does find again by a pre­ponderance of the evidence that Count 2 has been proven."

Reviewing this record in accordance with the proper standard of review, we conclude that the trial court's adjudica­tion of M.D.H. as an abused minor was not contrary to the mani­fest weight of the evidence.

III.  CONCLUSION

For the reasons stated, we affirm the trial court's judgment.  

Affirmed. 

GARMAN, P.J., and McCULLOUGH, J., concur.